# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE EZCORP INC. CONSULTING | ) | |
| AGREEMENT DERIVATIVE | ) | C.A. No. 9962-VCL |
| LITIGATION | ) | |

## MEMORANDUM OPINION

Date Submitted: October 27, 2015
Date Decided: January 25, 2016

Seth. D. Rigrodsky, Brian D. Long, Gina M. Serra, Jeremy J. Reilly, RIGRODSKY & LONG, P.A., Wilmington, Delaware; Nicholas I. Porritt, Adam M. Apton, LEVI & KORSINSKY, LLP, Washington, District of Columbia; *Counsel for Plaintiff Lawrence Treppel.*

Edward P. Welch, Edward B. Micheletti, Cliff C. Gardner, Lauren N. Rosenello, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Counsel for Defendants Phillip Ean Cohen, MS Pawn Corporation, MS Pawn Limited Partnership, and Madison Park, LLC.*

David C. McBride, Elena C. Norman, Nicholas J. Rohrer, Benjamin M. Potts, YOUNG, CONAWAY, STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Counsel for Defendant Thomas C. Roberts.*

Srinivas Raju, Sarah A. Clark, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Nominal Defendant EZCORP, Inc.*

**LASTER, Vice Chancellor.**

Plaintiff Lawrence Treppel is a stockholder of nominal defendant EZCORP, Inc. He brought this action derivatively to challenge the fairness of three advisory services agreements between EZCORP and defendant Madison Park LLC, an entity affiliated with defendant Phillip Ean Cohen, who is EZCORP's controlling stockholder (together, the "Challenged Agreements"). Treppel regards the agreements as an unfair means by which Cohen extracted a non-ratable return from EZCORP.

The complaint originally named as defendants the individuals who served on EZCORP's board of directors (the "Board") when the Challenged Agreements were approved. The complaint also named as defendants Madison Park, Cohen, and the two entities through which Cohen controls EZCORP. Since then, Treppel has dismissed all the individual defendants except Cohen and Thomas C. Roberts, one of the directors who approved two of the Challenged Agreements while serving on the Board's Audit Committee.

The remaining defendants moved to dismiss the complaint (i) pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted and (ii) pursuant to Rule 23.1 for failing to plead demand excusal. This decision grants the Rule 12(b)(6) motion in part, holding that Count IV of the complaint does not state a viable claim. Count III is dismissed as to Cohen on the same basis. Otherwise the motions are denied.

## I.  FACTUAL BACKGROUND

The facts for purposes of this decision are drawn predominantly from the Verified Amended Stockholder Derivative Complaint (the "Complaint") and the documents it incorporates by reference. Some additional facts are drawn from documents which the

1

defendants identified as subject to judicial notice. *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006). Despite having introduced and relied on those documents in their opening briefs, the defendants contended that Treppel could not refer to them in his answering brief, claiming that for him to do so would be to permit a plaintiff to rely on material outside the complaint. By making this inequitable argument, the defendants hoped to eat their cake (by going beyond the pleadings to rely on documents they chose and introduced) while still having it (by preventing Treppel from citing or arguing for inferences from the same documents).

The rule barring a plaintiff from introducing new material in an answering brief seeks to limit the extent to which the basis for a judicial decision can shift during briefing and guards against unfair prejudice to the defendants. These considerations do not apply when the defendants themselves introduce documents with their opening brief and argue persuasively that the materials are subject to judicial notice. At that point, the plaintiff and the court can rely on them as well.

The allegations of the Complaint and the documents suitable for consideration at the pleadings stage could support inferences that would favor either the plaintiff or the defendants. At this procedural stage, the plaintiff receives the benefit of all reasonable inferences. *See* Parts II & III, *infra.*

A.    **The Company**

EZCORP is a Delaware corporation with its headquarters in Austin, Texas. It provides instant cash solutions through a variety of products and services, including pawn loans, other short-term consumer loans, and purchases of customer merchandise.

2

EZCORP has two classes of stock: Class A Non-Voting Common Stock and Class B Voting Common Stock. The Class A stock trades publicly on NASDAQ under the ticker symbol "EZPW." Defendant MS Pawn L.P., a Delaware limited partnership, owns all of the Class B stock.

MS Pawn L.P. is controlled by its sole general partner, MS Pawn Corp. Cohen is the sole owner of the stock of MS Pawn Corp. Through MS Pawn L.P. and MS Pawn Corp. (together, "MS Pawn"), Cohen controls EZCORP.

One consequence of EZCORP's capital structure is that Cohen controls 100% of EZCORP's voting power despite owning only a minority of its equity. As of June 30, 2014, there were 50,612,246 shares of Class A stock outstanding, but only 2,970,171 shares of Class B stock outstanding. Except for voting rights carried by the Class B shares, the rights, powers, privileges, and preferences of the two classes of stock are functionally identical. The Class B shares through which Cohen controls EZCORP thus represent only 5.5% of the outstanding stock.

As control rights diverge from equity ownership, the controller has heightened incentives to engage in related-party transactions and cause the corporation to make other forms of non-*pro rata* transfers. Economists call this "tunneling." *See* Simon Johnson et al., *Tunneling*, 90 Am. Econ. Rev. 22 (2000). The basic insight is a simple one: by virtue of its control over the firm, the controller can direct how that firm deploys its capital. As an equity owner, the controller participates in the resulting benefits (and losses) in proportion to its equity stake, effectively gaining or losing on a *pro rata* basis with other stockholders. By contrast, in a related-party transaction, the controller receives 100% of

3

the benefit while only funding the payment to the extent of its equity stake. The balance of the payment is funded by the unaffiliated equity holders. The economic incentive to tunnel varies inversely with the controller's equity stake. All else equal, as the controller's equity stake declines, the relative benefit from a direct payment increase.[1]

To use a simple example, assume that EZCORP had sufficient net profits available to pay a dividend of $0.10 per share. The total cost of the dividend would be $5.36

---

[1] The simplified discussion in the text makes the basic point. The scholarly analyses are more complex and nuanced. *See, e.g.*, Lucian A. Bebchuk, Reinier Kraakman & George G. Triantis, *Stock Pyramids, Cross-ownership, and Dual Class Equity: The Mechanisms and Agency Costs of Separating Control from Cash-flow Rights*, *in* Concentrated Corporate Ownership 295 (R. Morck ed., 2000); Paul A. Gompers, Joy Ishii & Andrew Metrick, *Extreme Governance: An Analysis of Dual-Class Firms in the United States*, 23 Rev. Fin. Studs. 1051 (2010); Robert W. Masulis, Cong Wang & Fei Xie, *Agency Problems at Dual-Class Companies*, 64 J. Fin. 1697 (2009); Belen Villalonga & Raphael Amit, *How Are U.S. Family Firms Controlled*, 22 Rev. Fin. Studs. 3047 (2009); Hector V. Almeida & Daniel Wolfenzon, *A Theory of Pyramidal Ownership and Family Business Groups*, 61 J. Fin. 2637 (2006); Stijn Claessens et al., *Disentangling the Incentive and Entrenchment Effects of Large Shareholdings*, 57 J. Fin. 2741 (2002). There is empirical support for the insight. *See, e.g.*, Deborah A. Demott, *Guests At The Table? Independent Directors In Family-Influenced Public Companies*, 33 J. Corp. L. 819, 831-32 (2008) (describing study of dual-class companies which found that firm value was negatively associated with a "wedge" between cash-flow and voting rights, and that "firm value declines the greater the disproportion between insiders' economic interest in the firm and their degree of voting control" (quotation marks omitted)); *id.* at 833-34 (describing study of dual-class companies which found results consistent with the hypothesis that "insiders holding more voting rights relative to cash flow rights extract more private benefits at the expense of outside shareholders" (quotation marks omitted)); *see also* Maribel Sáez & María Gutiérrez, *Dividend Policy with Controlling Shareholders*, 16 Theoretical Inquiries L. 107, 127 (2015) (concluding that "all the empirical evidence for countries with concentrated ownership structures is consistent with" the theory that "controlling shareholders prefer to avoid pro-rata distributions of profits" and prefer to "keep retained earnings inside the corporation where they can redistribute a greater part of these earnings to themselves through tunneling, self-dealing and related party transactions").

million ($0.10 * 53,582,417 total shares outstanding). If Cohen owned 100% of the outstanding shares, then there would be no difference (ignoring tax effects) between having EZCORP declare the dividend on all shares versus paying Cohen $5.36 million directly under a services agreement or other form of contract. But as Cohen's assumed level of equity ownership declines, so does his share of a dividend, making the alternative of direct contractual compensation more attractive. At 51% equity ownership, Cohen would receive just over half of a dividend ($2.7 million), but he would receive all of a contractual payment. EZCORP's dual class structure makes the difference even more dramatic. Through the Class B shares, Cohen would receive only $297,017 from the dividend ($0.10 * 2,970,171 Class B shares) with the other 94% of the value going to the Class A shares. If EZCORP deployed the same $5.36 million of available cash to pay for advisory services from a Cohen entity, then Cohen would receive the entire $5.36 million while only indirectly bearing 5.5% of the cost through his equity stake. He would come out ahead by $5.065 million.

EZCORP's market capitalization is not large. On September 8, 2015 (the date of oral argument on the motions to dismiss), the Class A stock closed at $6.10 per share. The trading price implied an equity value of $326 million. As of January 21, 2016, the Class A stock closed at $3.29 per share. That figure represents a substantial discount from the shares' peak at $35.58 per share in May 2011.

## B.     The Predecessor Agreements

EZCORP has a history of entering into advisory services agreements with entities affiliated with Cohen. From 1996 through 2004, EZCORP entered into a series of

5

services agreements with non-party Morgan Schiff, an investment firm founded by Cohen. Under these agreements, EZCORP paid $33,333 per month to Morgan Schiff, which by 2004 had increased to $100,000 per month ($1.2 million annually). After an expense review, EZCORP discovered it had overpaid Morgan Schiff by $400,000. EZCORP recovered the overpayment and elected not to renew its arrangement with Morgan Schiff.

For part of the period covered by the agreements with Morgan Schiff, EZCORP paid a dividend to its stockholders. According to EZCORP's public filings, the Board declared an annual dividend of $0.05 per share in cash, payable quarterly, on August 25, 1998. EZCORP continued making a quarterly dividend payment of $0.0125 per share through March 31, 2000. Since then, EZCORP has not paid any dividends, and the Board has stated consistently that it does not anticipate paying any dividends in the future. Based on the number of shares currently outstanding, an annual dividend of $0.05 per share would cost $2.68 million. As previously noted, an annual dividend of $0.10 per share would cost $5.36 million.

In 2004, shortly after terminating its relationship with Morgan Schiff, EZCORP entered into a services agreement with a different Cohen affiliate, defendant Madison Park. The initial services agreement called for EZCORP to pay Madison Park $100,000 per month ($1.2 million annually) for a period of three years. Beginning in September 2007, when the initial services agreement expired, EZCORP and Madison Park entered into a series of annual services agreements. In the 2007 agreement, Madison Park's monthly fee increased by 50% to $150,000 ($1.8 million annually). In 2008, it increased

by 33% to $200,000 ($2.4 million annually). In 2009, it increased by 50% to $300,000 ($3.6 million annually). In 2010, it increased by 33% to $400,000 ($4.8 million annually).

## C.     The 2011 Agreement

On September 30, 2011, EZCORP entered into the first of the Challenged Agreements, which was to cover EZCORP's 2012 fiscal year (the "2011 Agreement"). In return for payments of $500,000 per month ($6 million annually), Madison Park agreed to provide advisory services relating to EZCORP's business and long term strategic planning, including

> (a) identifying, evaluating, and negotiating potential acquisitions and strategic alliances; (b) assessing operating and strategic objectives, including new business development; (c) advising on investor relations and relations with investment bankers, securities analysts, and other members of the financial services industry; (d) assisting in international business development and strategic investment opportunities; and (e) analyzing, evaluating, and advising on various financial matters.

Compl. ¶ 54. The payments to Madison Park under the 2011 Agreement represented approximately 5% of EZCORP's net income for that year. *Id.* ¶ 80.

The 2011 Agreement was approved by the Board's Audit Committee, comprising at the time defendant Roberts and previously dismissed defendants William C. Love and John Farrell. Each was an outside director. According to the Complaint, they rubber-stamped the 2011 Agreement without serious analysis because of their cozy positions as directors at Cohen's company. Roberts had been a director since 2005 and was paid $239,040 in that capacity in 2011. Love had joined the Board earlier in 2011 and was paid $209,040 for his service as a director in that year. Farrell had recently joined the

7

Board and received $15,285 for serving as a director in 2011. For purposes of calling into question the independence of directors of a Delaware corporation, those allegations are palpably thin.

**D.     The 2012 Agreement**

On October 1, 2012, EZCORP and Madison Park entered into the second of the Challenged Agreements, which covered EZCORP's 2013 fiscal year (the "2012 Agreement"). Under that agreement, Madison Park's fee increased by 20% to $600,000 per month ($7.2 million annually). In return, Madison Park agreed to provide the same services covered by the 2011 Agreement, plus three new items:

> [(i)] analyzing financial condition and the results of operations, including evaluating strengths and weakness of financial performance; [ii] advising on dividend policy, [and] . . . [(iii)] briefing the Board on business strategy. . . .

*Id.* ¶ 55. The payments to Madison Park under the 2012 Agreement again represented approximately 5% of EZCORP's net income for that year. *Id.* ¶ 80.

The Complaint alleges that the 2012 Agreement was approved by the Audit Committee, which again comprised Roberts, Love, and Farrell. The Complaint again asserts that they rubber-stamped the agreement without serious analysis because of their cozy positions as directors at Cohen's company.

By this point, Roberts had served for another year as a director of EZCORP, for which he was paid $261,076. Roberts also received an unidentified sum for his service as a director of Albemarle & Bond Holdings, plc ("Albemarle & Bond"), an EZCORP affiliate. The same was true for Farrell, who was paid $216,076 for serving as a director

8

of EZCORP and received an additional unidentified amount for serving as a director of Albemarle & Bond. Love too had served another year as a director of EZCORP, for which he was paid $234,076. He also served as a director of a different EZCORP affiliate, Cash Converters International Limited ("Cash Converters"), for which he received an unidentified amount.

Although marginally thicker than what the Complaint offered regarding the directors' incentives for purposes of the 2011 Agreement, the allegations regarding the 2012 Agreement remain meager. Noticeably absent was any quantification of the payments that the directors received from EZCORP affiliates.

### E.    The 2013 Renewal

On October 9, 2013, EZCORP and Madison Park agreed to extend the 2012 Agreement for another year (the "2013 Renewal"). The services that Madison Park agreed to provide and the compensation it received remained the same, but because revenue fell, the payments ended up representing approximately 21% of EZCORP's net income. *Id.* ¶ 80.

The Complaint alleges that the 2013 Renewal was approved by the Audit Committee, which at this point consisted of Love, Farrell, and Joseph J. Beal. The Complaint again alleges that they rubber-stamped the extension to preserve their cozy positions as directors. In 2013, Love was paid $250,345 for his service as a director of EZCORP, plus an additional $81,127 for serving as a director of Cash Converters. Farrell was paid $230,345 for his service as a director of EZCORP, plus an additional $69,174 for serving as a director of Albemarle & Bond. Beal had been a director since 2009 and

joined the Audit Committee in August 2013. He was paid $245,345 for his service in that year, plus $81,127 for serving as a director of Cash Converters. The quantification of the additional payments that the Audit Committee members received for serving as directors of other Cohen entities makes these allegations stronger.

## F.     Treppel's Criticisms Of The Challenged Agreements

Treppel contends that the Challenged Agreements were not legitimate contracts for services but rather a means by which Cohen extracted a non-ratable cash return from EZCORP. Madison Park was a small firm with limited resources, and EZCORP was its only publicly traded client in the United States. None of EZCORP's peer companies had retainer agreements with similar service providers.

During the period when EZCORP was paying Madison Park to provide advisory services related to core management functions, EZCORP had an experienced and highly compensated team of senior managers whose jobs included the tasks mentioned in the Challenged Agreements. For example, Paul E. Rothamel served as EZCORP's CEO. He had significant executive experience as a CEO and a history of leadership positions at large public and private companies. In its Form 10Ks, EZCORP described him as having executive management and expertise in the areas covered by the Challenged Agreements, including strategic planning, financial planning, risk management, and business development. *See id.* ¶ 39. Rothamel's job description covered similar areas. *See id.* ¶ 40. During the period covered by the Challenged Agreements, EZCORP paid Rothamel more than $12.2 million in total compensation. In 2012, Rothamel and EZCORP's named executive officers were in the 72nd percentile of peer companies in terms of

10

compensation. In 2013, Rothamel was in the 75th percentile of peer companies in terms of CEO compensation. *See id.* ¶ 46.

Also during the period covered by the Challenged Agreements, Mark E. Kuchenrither served as EZCORP's CFO. He had previously served in other executive capacities at EZCORP, as an executive at a major private equity firm, and as the CFO of two smaller companies. *See id.* ¶ 42. As with Rothamel, Kuchenrither had a job description that covered many of the areas where Madison Park ostensibly was being paid for its services, including planning, implementing, managing, and controlling EZCORP's financially related activities. *See id.* ¶ 43. During the period covered by the Challenged Agreements, EZCORP paid Kuchenrither approximately $7.89 million in total compensation.

Other members of EZCORP's senior management team had substantial backgrounds in finance, planning, and strategic development. Many had decades of experience in related fields and with other companies. As a group, the management team was well paid, receiving compensation that ranked in the 66th percentile for senior management among peer companies in 2012.

The Complaint observes that despite having an experienced and sophisticated management team, EZCORP paid Madison Park millions in fees under the Challenged Agreements. To reiterate, none of EZCORP's peer companies employed an outside firm to provide the kinds of advisory services that Madison Park purportedly provided to EZCORP. Indeed, according to the Complaint, the sum that EZCORP paid Madison Park "far exceeds what EZCORP or any of its comparable companies have paid its full-time

executives for providing the same services over the same period." *Id.* ¶ 2. As Treppel sees it, the services that Madison Park purportedly provided "were substantially, if not entirely duplicative of the services provided to [EZCORP] by Rothamel, Kuchenrither, and the rest of EZCORP senior management." *Id.* ¶ 77.

Treppel argues that the 2013 Renewal was all the more suspect because the amounts due to Madison Park remained the same even though EZCORP's net income went down.

> In fiscal year 2013, [EZCORP] only earned net income of $38.4 million, down significantly from the $150.5 million in net income from the year before. Despite this dramatic decrease, and the fact that [EZCORP's] net income in 2013 rivaled . . . its net income in 2007, [EZCORP] still paid Madison Park $7.2 million in fiscal year 2013 and agreed to pay the same amount for fiscal year 2014, compared to $6 million for fiscal year 2012, and $1.2 million in 2007 (the last time the Company earned net income of less than $40 million).

*Id.* ¶ 67. During 2013, the Compensation Committee refused to pay Rothamel or Kuchenrither a bonus because of EZCORP's poor performance. Two of the three members of the Compensation Committee (Beal and Love) also served on the Audit Committee, yet the Audit Committee continued to pay Madison Park at the same rate.

Treppel and his counsel do not contend that directors of a publicly traded company act questionably if they hire an external consulting firm. Far from it, they recognize that hiring a consulting firm can be entirely legitimate and prudent. The Complaint is factually and situationally specific: it questions one particular firm's hiring of a consulting company affiliated with its controller given the qualifications and capabilities of the firm, the circumstances associated with the hiring, the terms of the

services agreement, the compensation provided, and the interested nature of the relationship.

**G.      The Audit Committee Terminates The 2013 Renewal.**

On May 20, 2014, the Audit Committee terminated the 2013 Renewal. The members of the Audit Committee at the time were Love and Beal. The effective date of the termination was June 19, 2014. The Complaint supports a reasonable inference that Love and Beal terminated the relationship because they had concerns about the fairness of the relationship.

The termination of the 2013 Renewal prompted responses from both the plaintiff and Cohen. On July 9, 2014, Treppel sent a letter to EZCORP pursuant to 8 *Del. C.* § 220 (the "Section 220 Demand") in which he sought to examine the services agreements and related documents. On July 17, 2014, EZCORP refused to provide any of the requested documentation. Among other things, EZCORP claimed that the Section 220 Demand failed to set forth a credible basis to infer any wrongdoing.

Cohen's response had more immediate and dramatic effect. On July 18, 2014, he used his voting power to clean house. First, he removed Rothamel, Love, and Beal from the Board. To reiterate, Love and Beal were the members of the Audit Committee who had voted to terminate the services agreement with Madison Park, and Rothamel was the CEO at the time. A third director, Charles A. Bauer, resigned that same day.

Cohen filled one of the Board vacancies with Lachlan P. Given, who had been a managing director at Madison Park and was still a paid consultant to the firm. Given became the non-executive Chairman of the Board. Cohen filled another vacancy with

13

Kuchenrither, EZCORP's CFO, who became its interim CEO and President. After the changes, the Board comprised Kuchenrither, Given, Santiago Creel Miranda, and Pablo Lagos Espinosa. Miranda and Espinosa were outside directors. Roberts had retired from the Board in January 2014.

## H. This Litigation

Treppel commenced this action by filing his initial complaint on July 28, 2014 at 3:02 p.m. At that time, the Board still comprised Kuchenrither, Given, Miranda, and Espinosa. Treppel alleged that the Board could not impartially consider a litigation demand because at least two of the directors—Kuchenrither and Given—were insiders who were not independent from Cohen and Madison Park.

Approximately one hour after Treppel filed suit, EZCORP issued a press release announcing that the Board had "expanded its size to seven" and elected "Joseph L. Rotunda, Thomas C. Roberts, and Peter Cumins to serve as directors." Compl. ¶ 9. EZCORP issued the announcement through several media outlets, each after 4:00 p.m. GlobeNewswire and The Wall Street Journal published the announcement at 4:01 p.m. and 4:06 p.m., respectively.

Treppel filed the currently operative Complaint on September 23, 2014. It contains four counts:

- Count I asserted a claim for breach of fiduciary duty against the "Director Defendants," whom the Complaint defined as Love, Beal, Farrell, Espinosa, Roberts, Miranda, and Sterling B. Brinkley. Each of these individuals served as a member of the Board during the time when EZCORP entered into one or more of the Challenged Agreements.

14

- Count II asserted a claim for waste of corporate assets against the Director Defendants.

- Count III asserted a claim against Cohen and MS Pawn for aiding and abetting the Director Defendants in breaching their fiduciary duties.

- Count IV asserted a claim against Cohen and Madison Park for unjust enrichment.

All of the defendants moved to dismiss the Complaint and filed their opening briefs. Treppel proposed to dismiss voluntarily his claims against Rothamel, Espinosa, and Brinkley without prejudice, and this court approved the dismissal by separate order. After Treppel filed his answering brief, he proposed to dismiss voluntarily his claims against Love, Beal, and Farrell without prejudice. By separate opinion and order, this court dismissed the claims with prejudice as to Treppel only. At this point, the remaining defendants are Cohen, Madison Park, MS Pawn, and Roberts.

## II.     THE RULE 12(b)(6) ANALYSIS

The remaining defendants have moved to dismiss the Complaint pursuant to Rule 12(b)(6) for failing to state a claim on which relief can be granted. When considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and quotation marks omitted).

### A.     Cleaning Up The Complaint Through The Defense Of Laches

15

The Complaint's allegations described a series of related-party agreements, initially between EZCORP and Morgan Schiff and subsequently between EZCORP and Madison Park. When it addressed the Challenged Agreements, the Complaint did so in a jumbled way, as if the drafters originally targeted the 2013 Renewal and only later decided to add the 2011 and 2012 Agreements. The counts of the Complaint did not single out the Challenged Agreements. The reader must draw that inference from the relatively greater level of detail that the Complaint provided when dealing with those contracts. Not surprisingly, the defendants interpreted the Complaint as purporting to challenge every agreement it mentioned, and they raised defenses such as laches designed to limit the scope of the Complaint.

At oral argument, Treppel's counsel represented that the Complaint only attacked the Challenged Agreements. To eliminate any doubt, this decision holds that laches bars any claims relating to conduct predating July 28, 2011.

"[T]he limitations of actions applicable in a court of law are not controlling in equity." *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009). Nevertheless, because equity generally follows the law, "a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches." *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009). The analogous limitations period for the claims in this case is three years. *See* 10 *Del. C.* § 8106; *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004). Although a laches analysis is often fact-intensive, the doctrine can be applied at the pleadings stage if "the

16

complaint itself alleges facts that show that the complaint is filed too late." *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993) (Allen, C.).

In this case, Treppel filed his initial complaint on July 28, 2014. Any cause of action that accrued before July 28, 2011, is therefore presumptively barred by laches. There are no tolling doctrines that might apply. Accordingly, any claims addressing the services agreements that pre-dated July 28, 2011, are dismissed. The Challenged Agreements post-date July 28, 2011, with the 2011 Agreement having been executed on September 30, 2011, so those claims survive.

## B.     Count I: Breach of Fiduciary Duty

Count I of the Complaint alleges that by entering into the Challenged Agreements and making the payments they contemplated, the defendants breached their fiduciary duties. This count states a claim against Cohen, MS Pawn, and Roberts.

### 1.     The Proper Defendants

As originally plead, Count I contended that all of the members of the Board who served during 2011, 2012, and 2013 breached their fiduciary duties, but it did not contend that Cohen breached his fiduciary duties as a controlling stockholder. Count I thus identified as its targets the "Director Defendants," which it defined as Love, Beal, Farrell, Espinosa, Roberts, Miranda, and Brinkley. Based on the allegations of the Complaint, however, the full Board never acted on any of the Challenged Agreements. Only the Audit Committee did, and its members during those years, in varying combinations, were Love, Beal, Farrell, and Roberts. As noted, Treppel subsequently dismissed voluntarily Rothamel, Espinosa, and Brinkley, and this court dismissed Love, Beal, and Farrell.

17

Roberts is now the only named Director Defendant. There is no dispute that Roberts is a proper defendant for purposes of Count I, assuming the count states a claim.

For reasons that are comprehensible, but which in my view are neither legally sound nor persuasive, Treppel sued Cohen for aiding and abetting the breaches of duty committed by the Director Defendants, rather suing Cohen for breaching the fiduciary duties he owed as a controlling stockholder. In making this observation, I intimate no view as to whether Cohen actually breached his fiduciary duties. The question is the appropriate legal vehicle for seeking to hold him accountable. At oral argument, Treppel's counsel explained that he did not perceive Cohen as having taken action regarding the Challenged Agreements and hence did not believe Cohen could be sued in a fiduciary capacity. He therefore went the aiding-and-abetting route.

An ultimate human controller who engages directly or indirectly in an interested transaction with a corporation is potentially liable for breach of duty, even if other corporate actors made the formal decision on behalf of the corporation, and even if the controller participated in the transaction through intervening entities. Breach of fiduciary duty is an equitable claim, and it is a maxim of equity that "equity regards substance rather than form." *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983); *accord Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007) ("It is the very nature of equity to look beyond form to the substance of an arrangement."). Liability for breach of fiduciary duty therefore extends to outsiders who effectively controlled the corporation. *See, e.g.*, *S. Pac. Co. v. Bogert*, 250 U.S. 483, 488 (1919); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109-10 (Del. 1952). And because the application of equitable

18

principles depends on the substance of control rather than the form, it does not matter whether the control is exercised directly or indirectly. The United States Supreme Court's explanation of how a controller exercised control in *Southern Pacific* is illustrative:

> The Southern Pacific contends that the doctrine under which majority stockholders exercising control are deemed trustees for the minority should not be applied here, because it did not itself own directly any stock in the old Houston Company; its control being exerted through a subsidiary, Morgan's Louisiana & Texas Railroad & Steamship Company, which was the majority stockholder in the old Houston Company. But the doctrine by which the holders of a majority of the stock of a corporation who dominate its affairs are held to act as trustee for the minority does not rest upon such technical distinctions. It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation.

250 U.S. at 491-92.

Delaware corporate decisions consistently have looked to who wields control in substance and have imposed the risk of fiduciary liability on that person. In a seminal decision, Chancellor Wolcott imposed personal liability on the individual owners of a corporation that received a management fee from another corporation they controlled. *See Eshleman v. Keenan*, 187 A. 25 (Del. Ch. 1936). In that decision, defendants Keenan, Marvin, and Brewer controlled Consolidated Management Corp., which in turn owned a majority of the voting stock of Sanitary Company of America. The individual defendants received salaries as officers of Sanitary, and they also caused Sanitary to pay a monthly management fee to Consolidated. The stockholder plaintiffs complained that this amounted to "double compensation" and was constructively fraudulent, using that term in its early and mid-twentieth century sense as a synonym for breach of fiduciary duty. Chancellor Wolcott agreed and ordered restitution. Notably, he did not require

19

Consolidated to disgorge the payments. He looked instead to the humans behind the transaction and held Keenan, Brewer, and Marvin jointly and severally liable.

The Delaware Supreme Court affirmed. *Keenan v. Eshleman*, 2 A.2d 904 (Del. 1938). Like Chancellor Wolcott, the high court ruled that the individual defendants were liable to Sanitary; that Consolidated was the formal corporate vehicle behind the transactions did not matter:

> The conception of corporate entity is not a thing so opaque that it cannot be seen through; and, viewing the transaction as one between corporations, casual scrutiny reveals that the appellants, in fact, dealt with themselves to their own advantage and enrichment. The employment of Consolidated by Sanitary was merely the employment by the appellants of themselves to do what it was their plain duty to do as officers of Sanitary.

*Id.* at 908. Like Chancellor Wolcott, the high court held the individual defendants—and not Consolidated—jointly and severally liable.

Since *Keenan*, Delaware cases consistently have looked to who wields control over the corporation and have imposed the risk of fiduciary liability on that individual.[2]

---

[2] *See Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110, 1114 (Del. 1994) (holding that 43% stockholder that exercised actual control over subsidiary could be liable for breach of fiduciary duty); *Sterling*, 93 A.2d at 109-10 (citing "the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property"); *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *18 (Del. Ch. Feb. 11, 2015) (holding that individual who controlled a complex family of funds that acquired control of corporation could be personally liable to corporation's minority stockholders for breach of fiduciary duty); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 671 (Del. Ch. 2012) (applying corporate principles and holding that managing member of an LLC that was the managing member of a second LLC could be held personally liable for first LLC's breach of fiduciary duty); *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *15 (Del. Ch. July 26, 2010) (Strine, V.C.) ("Fairly read, the complaint alleges that DLJ, Inc. presided over a family of entities that it

The same is true for human controllers of other types of entities, at least for breaches of the duty of loyalty. *See In re USACafes, L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991) (Allen, C.). In this case, Cohen is a proper defendant to sue for fiduciary breach.

In my view, the MS Pawn entities likewise are appropriate defendants for a breach of fiduciary duty claim. The limited partnership and the corporation were the vehicles through which Cohen controlled EZCORP. The limited partnership was EZCORP's immediate controller. The corporation controlled the limited partnership and was EZCORP's indirect controller. Cohen controlled the corporation and was EZCORP's ultimate controller. As discussed below, the MS Pawn entities alternatively can be sued

---

dominated and controlled, including the entities that together owned 74% of Insilco's equity. Using their unified power in a concerted way, DLJ controlled Insilco and directed its business strategy, including causing it to employ the DLJ Advisors. . . . I believe that Shandler has pled sufficient facts from which it can be inferred that the DLJ Funds were instrumentalities operated for the benefit of DLJ, Inc. and DLJMB."); *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 258 n.26 (Del. Ch. 2006) (holding that private equity firm could owe fiduciary duties to non-controlling stockholders when firm controlled corporation through intervening entities); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at * 38-39 (Del. Ch. May 3, 2004) (holding that human controller of family of entities that executed an unfair squeeze-out merger was liable for breach of fiduciary duty in his capacity as majority stockholder); *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 491 (Del. Ch. 1923) (Wolcott, C.) ("When, in the conduct of the corporate business, a majority of the voting power . . . join hands in imposing its policy upon all, it is beyond all reason . . . to take any view other than that they are to be regarded as having placed upon themselves the same sort of fiduciary character which the law impresses upon the directors in their relation to all the stockholders."); *Martin v. D.B. Martin Co.*, 88 A. 612, 615 (Del. Ch. 1913) ("For the protection of the rights of stockholders of the dominant, or parent company, and for righting of wrongs done them by means of the control of the dominant, or parent, company . . . the latter are to be treated as agents of the former, or even as identical with each other.").

21

for aiding and abetting. As I see it, the breach of fiduciary duty claim is more straightforward.

These rulings create a procedural problem, because the plaintiffs technically did not sue Cohen or MS Pawn for breach of fiduciary duty. The defendants view this as a clean winner that necessarily results in dismissal with prejudice under Rule 15(aaa). I do not believe that the plaintiff's pleading choice is fatal. "So long as claimant alleges facts in his description of a series of events from which [a claim] may reasonably be inferred and makes a specific claim for the relief he hopes to obtain, he need not announce with any greater particularity the precise legal theory he is using." *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979). The factual allegations in the Complaint give rise to a claim for breach of fiduciary duty against Cohen and MS Pawn. The alternative would be to grant the plaintiffs leave to re-plead for good cause shown, but that seems unnecessary, as they simply would add Cohen's and MS Pawn's names to Count I.

### 2. The Applicable Standard Of Review

"When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion."[3] "[T]he defendants bear the burden of proving that the transaction with the controlling stockholder was entirely fair to the minority stockholders." *Ams. Mining*, 51 A.3d at 1239. The defendants may seek to lower

---

[3] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012); *accord Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 642 (Del. 2014); *Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422, 428 (Del. 1997).

the standard of review from entire fairness by showing that the controller did not stand on both sides of the transaction. One means of accomplishing this is by using procedural devices such as (i) the creation of a sufficiently authorized board committee composed of independent and disinterested directors or (ii) the conditioning of the transaction on the affirmative vote of a majority of the shares owned by stockholders who are not affiliated with the controller. *See Lynch*, 638 A.2d at 1117.

If a controller agrees up front, before any negotiations begin, that the controller will not proceed with the proposed transaction without both (i) the affirmative recommendation of a sufficiently authorized board committee composed of independent and disinterested directors and (ii) the affirmative vote of a majority of the shares owned by stockholders who are not affiliated with the controller, then the controller has sufficiently disabled itself such that it no longer stands on both sides of the transaction, thereby making the business judgment rule the operative standard of review. *M & F Worldwide*, 88 A.3d at 644. If a controller agrees to use only one of the protections, or does not agree to both protections up front, then the most that the controller can achieve is a shift in the burden of proof such that the plaintiff challenging the transaction must prove unfairness. *Ams. Mining*, 51 A.3d at 1240.

Under current law, the entire fairness framework governs any transaction between a controller and the controlled corporation in which the controller receives a non-ratable benefit. This is because "Delaware is more suspicious when the fiduciary who is interested is a controlling stockholder." Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J.

Corp. L. 673, 678 (2005). A controlling stockholder occupies a uniquely advantageous position for extracting differential benefits from the corporation at the expense of minority stockholders. *See id.* There is also "an obvious fear that even putatively independent directors may owe or feel a more-than-wholesome allegiance to the interests of the controller, rather than to the corporation and its public stockholders." *Id.*

> [T]he underlying factors which raise the specter of impropriety can never be completely eradicated and still require careful judicial scrutiny. This policy reflects the reality that in a transaction such as the one considered . . . , the controlling shareholder will continue to dominate the company regardless of the outcome of the transaction. The risk is thus created that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder.

*Tremont II*, 694 A.2d at 428 (citations omitted). "For that reason, when a controlling stockholder is on the other side of the deal from the corporation, our law has required that the transaction be reviewed for substantive fairness even if the transaction was negotiated by independent directors or approved by the minority stockholders." Strine, *supra*, at 678.

The entire fairness framework clearly governs squeeze-out mergers, but Delaware courts also have applied it more broadly to transactions in which a controller extracts a non-ratable benefit. In several decisions, the Delaware courts have expressly rejected the contention that the entire fairness framework only applies to squeeze-out mergers.

- In *Kahn v. Tremont Corp. (Tremont I)*, 1996 WL 145452 (Del. Ch. Mar. 21, 1996), Chancellor Allen applied the entire fairness framework to Tremont Corporation's purchase of 15% of the stock of NL Industries, Inc. from Valhi, Inc. At the time of the transaction, Harold Simmons controlled all three corporations. He owned 90% of Valhi, which owned 44.4% of Tremont and 62.5% of NL. Tremont's board formed a three member special committee to evaluate the transaction. Chancellor Allen rejected the defendant's argument that the "operation of the Special Committee triggers business judgment" review. *Id.* at *7. He also rejected the defendant's attempt to limit

entire fairness review to squeeze-out mergers, stating that there is "no plausible rationale for a distinction between mergers and other corporate transactions and in principle I can perceive none." *Id.* Chancellor Allen held that "a committee can only shift to plaintiff the burden of proving that the transaction was unfair." *Id.* On the facts presented, Chancellor Allen held that the committee operated effectively, shifted the burden, and that the transaction was entirely fair.[4]

- In *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536 (Del. Ch. 2000), Vice Chancellor Lamb applied the entire fairness framework to a services agreement between Seaman Furniture Company and another company owned by Seaman's controlling stockholder, Resurgence Asset Management, L.L.C. Under the services agreement, Seaman agreed to manage stores and provide operational expertise to the company in return for a multi-million dollar annual fee. Vice Chancellor Lamb rejected the defendants' argument that the business judgment rule applied because the contract was "not a merger but a 'business transaction.'" *Id.* at 551. He reasoned that "both the Supreme Court and this court explicitly [have] held that the entire fairness standard of review applies in the non-merger context to interested transactions involving controlling stockholders." *Id.* at 552. He also concluded that the defendants would bear the burden at trial because the record demonstrated that they "consciously chose not to employ any independent bargaining mechanism in negotiating the Agreements." *Id.* at 553.

- In *Harbor Finance Partners v. Sugarman*, 1997 WL 162175 (Del. Ch. Apr. 3, 1997), Justice Jacobs, then a Vice Chancellor, applied the entire fairness framework to a company's repurchase of a block of its notes from its controlling stockholder. Vice Chancellor Jacobs denied the controller's motion to dismiss, explaining that "[i]f the plaintiff proves that Giant exercised control, the defendants will have the burden of proving that the transaction was entirely fair." *Id.* at *2. He further explained that "[t]he rule that a controlling stockholder may not benefit from dealings with the corporation to the detriment of other stockholders is not limited to mergers." *Id.*

---

[4] On appeal, the Delaware Supreme Court held that the special committee had not functioned effectively and reversed for a new determination of fairness with the burden properly assigned. *Tremont II*, 694 A.2d at 430. The Delaware Supreme Court did not reverse any of the Chancellor's legal rulings. *Id.* at 432. In light of this disclosure, citations to *Tremont I* omit the cumbersome "*rev'd on other grounds*."

In other decisions, Delaware courts have applied the entire fairness framework to a variety of transactions in which controlling stockholders have received non-ratable benefits, implicitly rejecting the view that the framework only applies to squeeze-outs.

- In *Tremont II*, the Delaware Supreme Court considered an appeal from Chancellor Allen's decision in *Tremont I*. The high court reversed Chancellor Allen's factual finding that the special committee operated independently. *See* 694 A.2d at 424. The Delaware Supreme Court affirmed that the entire fairness framework provided the operative standard of review for the asset transfer, holding that "[r]egardless of where the burden lies, when a controlling shareholder stands on both sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard." *Id.* at 428. The high court explained that "[e]ntire fairness remains applicable even when an independent committee is utilized because the underlying factors which raise the specter of impropriety can never be completely eradicated and still require careful judicial scrutiny." *Id.*

- In *Levco Alternative Fund Ltd. v. Reader's Digest Ass'n, Inc.*, 803 A.2d 428 (Del. 2002) (TABLE), the Delaware Supreme Court applied the entire fairness standard to a recapitalization in which a corporation repurchased shares from its controlling stockholder in return for a combination of cash and stock. The Court of Chancery had applied the entire fairness standard but declined to issue a preliminary injunction blocking the transaction because it appeared entirely fair. The high court agreed that the entire fairness standard applied but reversed the Court of Chancery's conclusion regarding fairness and issued the injunction.

- In *Nixon v. Blackwell*, 626 A.2d 1366 (Del. 1993), the Delaware Supreme Court applied the entire fairness standard to transactions that the controlling stockholders of E.C. Barton & Co. used to generate liquidity for themselves and other company employees. The directors controlled the company through their ownership of all of its Class A voting stock. The plaintiffs owned Class B non-voting stock. They challenged an employee stock option plan ("ESOP") and key man life insurance policies that were used to repurchase Class A voting shares. Similar liquidity opportunities were not available for Class B holders. The Delaware Supreme Court held that the entire fairness standard of review governed the transactions because the controlling Class A stockholders "benefited from the ESOP and could have benefited from the key man life insurance beyond that which benefited other stockholders generally, [and therefore] the defendants are on both sides of the transaction." *Id.* at 1375.

- In *Summa v. Trans World Airlines, Inc.*, 540 A.2d 403 (Del. 1988), the Delaware Supreme Court applied the entire fairness framework to a series of transactions in

26

which Trans World Airlines, Inc. purchased aircraft or leased planes from its controlling stockholder. The high court explained that "[i]t is well established in Delaware that one who stands on both sides of a transaction has the burden of proving its entire fairness." *Id.* at 406.

- In *Shandler v. DLJ Merchant Banking, Inc.*, 2010 WL 2929654 (Del. Ch. July 26, 2010), Chief Justice Strine, then a Vice Chancellor, applied the entire fairness standard to a transaction in which Insilco Technologies, Inc. sold assets to an affiliate of Donaldson, Lufkin & Jenrette, Inc., its controlling stockholder. He denied the defendants' motion to dismiss, explaining that they could not "try the issue of fairness on a dismissal motion." *Id.* at *12 n.108.

- In *In re Loral Space & Communications Inc.*, 2008 WL 4293781 (Del. Ch. Sept. 19, 2008), Chief Justice Strine, then a Vice Chancellor, applied the entire fairness standard to a transaction in which a company's controlling stockholder invested $300 million in return for "convertible preferred stock with a high dividend rate and low conversion rate compared to the market comparables identified by its advisor." *Id.* at *1. Vice Chancellor Strine found that a special committee formed by Loral's board had not functioned effectively and therefore did not have any effect on the standard of review.

- In *Flight Options International, Inc. v. Flight Options, LLC*, 2005 WL 5756537 (Del. Ch. July 11, 2005), Vice Chancellor Noble considered a transaction in which a controlled LLC repurchased membership interests from its controller. Vice Chancellor Noble observed that because the controller "st[ood] on both sides" of the issuance, "the appropriate standard for review of their conduct would be 'entire fairness'" if the parties had not specifically contracted for a different standard of review in their operating agreement. *Id.* at *7 n.28.

- In *In re New Valley Corp.*, 2001 WL 50212 (Del. Ch. Jan. 11, 2001), Chancellor Chandler applied the entire fairness standard to a corporation's purchase of a subsidiary from its controlling stockholder. The New Valley board established a special committee to evaluate the transaction. Chancellor Chandler held that at the motion to dismiss stage, the use of a special committee did not alter the standard of review. He explained that "because the Court is evaluating the legal sufficiency of the complaint, it has no evidence from the defendants that would allow it to determine whether they have adequate proof that a truly independent committee with real bargaining power evaluated the transaction." *Id.* at *7. The court concluded that it was "not adequately poised to determine if the defendants have successfully shifted the burden to the plaintiffs." *Id.*

- In *Strassburger v. Earley*, 752 A.2d 557 (Del. Ch. 2000), then-Vice Chancellor Jacobs applied the entire fairness standard to a transaction in which Ridgewood Properties,

Inc. repurchased stock from its controlling stockholder and another large stockholder. He explained that "where the controlling shareholder and the directors stand on both sides of the transaction, they bear the burden to demonstrate the transaction was entirely fair to the corporation." *Id.* at 570. He rejected the argument that a special committee had acted with sufficient integrity to shift the burden of proof to the plaintiffs.

- In *In re Dairy Mart Convenience Stores, Inc.*, 1999 WL 350473 (Del. Ch. May 24, 1999), Chancellor Chandler applied the entire fairness standard to a transaction in which Dairy Mart Convenience Stores, Inc. repurchased stock from its controlling stockholder. He rejected the "defendants' suggestion that in order to invoke entire fairness review the plaintiff must present evidence that the directors were dominated by" the controlling stockholders. *Id.* at *17. He held that "[u]nder our jurisprudence, where a controlling shareholder has the power to influence the competing sides of a bargaining process, and where there are claims of actual abuse of that power to the benefit of the controlling shareholder at the corporation's expense, it is well established that the Court subjects the transactions in question to entire fairness review." *Id.*

- In *In re MAXXAM, Inc.*, 659 A.2d 760 (Del. Ch. 1995), then-Vice Chancellor Jacobs court rejected a settlement of a derivative action that challenged a loan from a corporation to its controlling stockholder and the controller's subsequent purchase of a real estate development from the corporation. The court noted that "where a shareholder owing . . . fiduciary duties stands on both sides of a challenged transaction, it will be required to demonstrate that the transaction was entirely fair to the corporation." *Id.* at 771. The court rejected the defendants' claim that the approval of a special committee warranted business judgment review.

Of particular relevance to this case, Delaware decisions have applied the entire fairness framework to compensation arrangements, consulting agreements, services agreements, and similar transactions between a controller or its affiliate and the controlled entity. One precedent is the *T. Rowe Price* decision, discussed previously, in which Vice Chancellor Lamb applied the entire fairness standard to a services agreement and rejected the argument that the business judgment rule applied because the contract was "not a merger but a 'business transaction.'" 770 A.2d at 551. The following additional cases are illustrative:

- In *Monroe County Employees' Retirement System v. Carlson*, 2010 WL 2376890 (Del. Ch. June 7, 2010), Chancellor Chandler applied the entire fairness standard to a services agreement pursuant to which a controlling stockholder provided "a panoply of services" to its controlled subsidiary. *Id.* at *1. Chancellor Chandler explained that that "[u]nder Delaware law, transactions between a controlling stockholder and the corporation it controls are reviewed for entire fairness." *Id.*

- In *Carlson v. Hallinan*, 925 A.2d 506 (Del. Ch. 2006), Vice Chancellor Parsons used the entire fairness standard to evaluate (i) compensation paid to a corporation's controlling stockholder, who was also a director, (ii) management fees paid to affiliates of the controlling stockholder, and (iii) the failure to allocate expenses properly to affiliates of the controlling stockholder who received services from the corporation. Vice Chancellor Parsons held that "where directors stand on both sides of a transaction, they have the burden of establishing its entire fairness." *Id.* at 529 (quotation marks omitted). The court also rejected the defendant's argument that the burden shifted to the plaintiff because they, as majority stockholders, approved the transactions.

- In *Quadrant Structured Products Co., Ltd. v. Vertin*, 102 A.3d 155 (Del. Ch. 2014), I applied the entire fairness standard to payments made under a license agreement between a company and its controlling stockholder, EBF & Associates. I also applied entire fairness to the company's decision not to defer paying interest on junior notes owned by EBF, even though the company had the right to defer interest and, at the pleading stage, the allegations of the complaint supported a reasonable inference that it would have been prudent to do so. I explained that "[b]y virtue of the decision not to defer interest [and to pay the licensing fees], funds flowed from the Company to EBF. As the owner of 100% of the Company's equity, EBF controlled the Company and stood on both sides of the transaction . . . making entire fairness the governing standard of review with the burden of proof on the defendants." *Id.* at 183-85.

- In *Dweck v. Nasser*, 2012 WL 161590 (Del. Ch. Jan. 18, 2012), I applied the entire fairness standard to (i) consulting fees that a corporation, Kids International Corporation, paid to its controlling stockholder and (ii) a joint venture that the corporation entered into with Seabreeze Apparel, an entity affiliated with the controlling stockholder. I explained that "[t]he payments . . . were interested transactions between a corporation and its controlling shareholder, so Nasser bore the burden of demonstrating their entire fairness to Kids." *Id.* at *22. I also explained that "[b]ecause Nasser controlled both Kids and Seabreeze, the joint venture is subject to entire fairness review." *Id.* at *23.

29

Viewed in the aggregate, these decisions indicate that the entire fairness framework applies to the Challenged Agreements. Scholars have interpreted Delaware precedents similarly.[5]

### 3. *Tyson*, *Dolan*, **and** *Canal*

The defendants have found three rulings that did not apply the entire fairness framework to transactions through which a controller extracted a non-ratable benefit: *Dolan*, *Tyson*, and *Canal*.[6] If the Delaware Supreme Court were to limit the entire

---

[5] *See, e.g.*, Jens Dammann, *Corporate Ostracism: Freezing Out Controlling Shareholders*, 33 J. Corp. L. 681, 685 (2008) (summarizing Delaware law; stating that it protects against controller expropriation "by monitoring individual transactions that are suspected of benefitting the controller at the expense of the other shareholders" and observing that "in Delaware, all contracts between the controller and the corporation are subject to a test of entire fairness, even if they have been approved by a committee of independent directors."); Zohar Goshen, *The Efficiency of Controlling Corporate Self-Dealing: Theory Meets Reality*, 91 Cal. L. Rev. 393, 429 (2003) (explaining that Delaware polices self-dealing transactions using the entire fairness test and asserting that Delaware "has developed a coherent and very efficient solution to the self-dealing problem").

[6] *See, e.g.*, *Friedman v. Dolan*, 2015 WL 4040806 (Del. Ch. June 30, 2015); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563 (Del. Ch. 2007); *Canal Capital Corp. v. French*, 1992 WL 159008 (Del. Ch. July 2, 1992).

There also are decisions which have questioned whether the full entire fairness framework applies outside of squeeze-out mergers involving a controlling stockholder. *See In re MFW S'holders Litig.*, 67 A.3d 496, 526-27 (Del. Ch. 2013) (Strine, C.) ("Outside the controlling stockholder merger context, it has long been the law that even when a transaction is an interested one but not requiring a stockholder vote, Delaware law has invoked the protections of the business judgment rule when the transaction was approved by disinterested directors acting with due care."), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014); *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 669 n.19 (Del. Ch. 2006) (Strine, V.C.) (commenting that the extent to which "a line of decisions that focus on conflicted mergers with controlling stockholders. . . . applies outside that context is an ongoing subject of debate"); *Orman v. Cullman*, 794

fairness framework to squeeze-out mergers, as one of these decisions suggests, then I of course would adhere to that ruling. At present, however, it appears to me that the weight of authority calls for applying the entire fairness framework more broadly and that the three cases are not persuasive.

The defendants rely most heavily on *Dolan*, a recent case which stated that "[e]ntire fairness is not the default standard for compensation awarded by an independent board or committee, even when a controller is at the helm of the company." 2015 WL 4040806, at *5. As support for that proposition, the *Dolan* decision cited *Tyson*. *Id.* at *5 nn.34 & 36. Consequently, this decision begins with *Tyson*, moves to *Dolan*, and finishes with *Canal*, which appears to stand alone as a relatively isolated precedent.

### a. *Tyson*

---

A.2d 5, 20 n.36 (Del. Ch. 2002) ("Recognizing the practical implications of the automatic requirement of an entire fairness review has led our Supreme Court to limit such automatic requirement to the narrow class of cases in which there is a controlling shareholder on both sides of a challenged merger."). The comments in these decisions appear geared primarily towards the point that when an interested transaction does not involve a controlling stockholder, the use of a special committee or the receipt of disinterested stockholder approval lowers the standard of review from entire fairness to the business judgment rule. *See MFW*, 67 A.3d at 527 n.149 (contrasting controlling stockholder merger rule with precedents involving transactions with fellow directors); *Aidinoff*, 900 A.2d at 669 n.19 (controlling stockholder merger rule with "an interested transaction between a company and one or two of its directors who are not affiliated with a controlling stockholder" (quotation marks omitted)); *Orman*, 794 A.2d at 20 n.36 (stressing that *Emerald Partners* decision turned on "Hall's fiduciary status as a *controlling* stockholder"). At least as I read them, the cases do not necessarily suggest that the business judgment rule should apply to a transaction in which a controller extracts a non-ratable benefit.

In the *Tyson* case, stockholder plaintiffs filed "a lengthy and complex complaint that include[d] almost a decade's worth of challenged transactions" involving Tyson Foods, Inc., the members of the Tyson family who controlled the company and served as its senior managers, and their fellow directors. 919 A.2d at 570. By virtue of Tyson's dual class structure and an investment partnership, family patriarch Don Tyson controlled over 80% of Tyson's voting power despite owning only approximately 30% of its equity. Don's son John served as Tyson's CEO and Chairman. With evident frustration at the plaintiffs' blunderbuss pleading and the parties' extensive submissions, the court observed that

> Plaintiffs level charges, more or less indiscriminately, at eighteen individual defendants, one partnership, and the company itself as a nominal defendant. Several allegations are leveled at clearly inappropriate directors or challenge actions well beyond the statute of limitations. Over six hundred pages of additional documents and briefs have been filed by one party or another in order to provide context for my decision.

*Id.*

After an extensive discussion of the facts, the court concluded that demand was futile under Rule 23.1 for purposes of all of the challenged transactions but that certain claims were barred by the statute of limitations. The court then examined the merits of a challenge to a revised consulting contract between Tyson and Don, which the board approved in July 2004. The revised agreement increased Don's compensation from $800,000 to $1.2 million annually, provided for his payments to continue until 2011, and called for the payments to be made to his children in the event of his death.

For purposes of determining the standard of review, the *Tyson* decision stated: "As the consulting agreement does not fall outside the bounds of business judgment, Count I can only withstand a motion to dismiss by sufficiently alleging that a majority of those who approved the transaction were dominated or otherwise conflicted." *Id.* at 587. As support for this statement, the decision cited *Aronson v. Lewis*.[7] *See Tyson*, 919 A.2d at 587 n.57. As noted below, it does not oversimplify matters to say that the defendants' argument for a lower standard of review rests ultimately on the breadth of *Aronson*. *See*, *infra*, Part II.B.3.d. The *Tyson* decision did not identify or discuss the cases that have taken a different approach to the receipt of non-ratable benefits by a controlling stockholder. *See*, *supra*, Part II.B.3.a.

As described in this section of the opinion, when the board approved Don's consulting agreement, it had ten directors: four were not independent (John Tyson,

---

[7] 473 A.2d 805 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72-73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624-25 (Del. 1984); and *Aronson*, 471 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 253-54. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review (trial court decisions rarely do). Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision choses to omit the cumbersome subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Delaware canon.

Barbara Tyson, Bond, and Tollett), and six were outsiders (Hackley, Kever, Jones, Smith, Zapanta, and Allen). Finding that there was an independent board majority, the court cited *Brehm v. Eisner*, 746 A.2d 244 (2000), for the proposition that "a board's decision on executive compensation is entitled to great deference." *Tyson,* 919 A.2d at 588 & n.61. The *Brehm* decision was arguably distinguishable in that it involved a corporation without a controlling stockholder that had a supermajority-independent board, and the challenged decisions involved the hiring and firing of a second-in-command, not the approval of direct compensatory benefits for the controlling stockholder. *See Brehm*, 746 A.2d at 248-49, 254-58.

By applying the business judgment rule to a controlling stockholder transaction, the *Tyson* decision ran contrary to the approach that other Delaware cases had taken, including decisions addressing consulting agreements. *See, supra*, Part II.B.2 & II.B.3.a. The *Tyson* decision did not grapple with the possibility that entire fairness might apply. In other decisions issued both before and after *Tyson*, the author of that opinion held that entire fairness did apply as the baseline standard of review for transactions other than mergers between the corporation and its controlling stockholder.[8] In my view, these factors undercut *Tyson*'s persuasiveness.

       **b.**    ***Dolan***

---

[8] *See Monroe Cty.*, 2010 WL 2376890, at *1; *New Valley*, 2001 WL 50212, at *7; *Dairy Mart*, 1999 WL 350473, at *17.

Until *Dolan*, in the eight years since *Tyson*, no Delaware decision had cited *Tyson* for the proposition that the business judgment rule applied at the outset to a consulting agreement between a controlling stockholder and the controlled corporation. Cases instead applied the entire fairness framework. *See*, *supra*, Part II.B.2. The *Dolan* decision, however, applied the business judgment rule, citing *Tyson*. And like *Tyson*, the *Dolan* decision relied on *Brehm,* this time for the proposition that "[i]t is the essence of business judgment for a board to determine if a particular individual warrant[s] large amounts of money." 2015 WL 4040806, at \*5 (quoting *Brehm,* 746 A.2d at 263). That is true when the business judgment rule applies, but it elides the threshold question of whether the business judgment rule applies.

The plaintiffs in *Dolan* challenged the compensation that Cablevision Systems Corporation paid to Charles F. Dolan, its founder and its Executive Chairman since 1985, and to his son James L. Dolan, who had served as CEO since 1995 and had been a director since 1991. 2015 WL 4040806, at \*1. By virtue of their ownership of supermajority voting shares, the Dolans controlled 73% of Cablevision's voting power, despite owning a fraction of the equity. *See id.* at \*2. The super-voting shares also held the right to elect three quarters of the Cablevision board. Cablevision identified itself as a controlled company for purposes of the New York Stock Exchange Rules. A three-member compensation committee approved the Dolans' compensation packages.

Unlike *Tyson*, the *Dolan* court discussed the argument that entire fairness applied *ab initio*. Relying on *Tyson*, the court held that the business judgment rule provided the

operative standard of review. The court rejected the plaintiffs' reliance on non-merger

cases that had applied the entire fairness framework, explaining its rational as follows:

> [M]ajor concerns in applying entire fairness review are informational
> advantages and coercion. The complaint does not support its allegations of
> *leveraging* control over the compensation committee with a factual basis to
> make that inference, and it is hard to imagine a material informational
> advantage James and Charles held about the value of their services.
> Additionally, the Court hesitates to endorse the principle that every
> controlled company, regardless of use of an independent committee, must
> demonstrate the entire fairness of its executive compensation in court
> whenever questioned by a shareholder. It is especially undesirable to make
> such a pronouncement here, where annual compensation is not a
> "transformative" or major decision.

*Id.* at *6 (footnote omitted). In a footnote, the opinion continued:

> Although there might be concerns about the extent to which negotiations
> are truly at arm's-length, our law—*Tyson* is a persuasive example—
> respects the judgment of independent directors. Moreover, reflexively
> reviewing decisions of independent directors who serve in the often
> difficult environment of controlled corporations would offer little benefit to
> those corporations or their shareholders.

*Id.* at *6 n.40.

These policy arguments assert contestable propositions that depend on debatable

empirical claims. Numerous authorities identify, describe, and discuss the informational

advantages that controllers and senior managers have over directors, particularly on the

issues of compensation, performance, and the value of their services.[9] Stated generally,

---

[9] *See, e.g.*, John C. Coffee Jr., Gatekeepers: The Professions and Corporate
Governance 7 (2006) ("The board of directors in the United States is today composed of
directors who are essentially part-time performers with other demanding responsibilities.
So structured, the board is blind, except to the extent that the corporation's managers or
its independent gatekeepers advise it of impending problems."); Lucian Bebchuk & Jesse
Fried, Pay Without Performance: The Unfulfilled Promise of Executive Compensation 2,

"[t]he distribution of information in the corporation is highly asymmetrical: the officers typically not only have much more information than the board, but control much of the flow of information to the board. By controlling the information that the board receives, the officers heavily shape the decisions that the board makes." Melvin Aron Eisenberg, Corporations and Other Business Organizations: Cases and Materials 198 (9th ed. 2005).

---

37-39 (2004) (describing informational disparities and limited avenues that outside directors have when making compensation decisions), *cited in In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 699 n.1 (Del. Ch. 2005); Lisa M. Fairfax, *Sue on Pay: Say on Pay's Impact on Directors' Fiduciary Duties*, 55 Ariz. L. Rev. 1, 17 (2013) (describing the dominant framework for understanding executive compensation, which recognizes that "directors are too often at an informational disadvantage when assessing and approving compensation packages. As a result, they defer to executives or other corporation managers who may have more expertise and experience." (footnote omitted)); Michael B. Dorff, *Does One Hand Wash the Other? Testing the Managerial Power and Optimal Contracting Theories of Executive Compensation*, 30 J. Corp. L. 255, 261, 266-67 (2005) (describing the Managerial Power Hypothesis as including the claim that "directors who wish to question management, despite [other] contrary incentives, have limited resources with which to do so" and finding that the results of the article's analysis "strongly support the Managerial Power Hypothesis, that the existence of managerial power over directors erodes directors' ability to restrain managers from pursuing their own interests at the corporation's expense"); Lucian Arye Bebchuk, Jesse M. Fried & David I. Walker, *Managerial Power and Rent Extraction in the Design of Executive Compensation*, 69 U. Chi. L. Rev. 751, 766 (2002) (discussing problems that independent directors face when overseeing insiders' compensation and performance, including that "even if directors were otherwise inclined to challenge managers on the issue of executive compensation, they would likely have neither the financial incentive nor sufficient information to do so"); *id.* at 772 ("[E]ven if directors have the inclination and incentive to negotiate for CEO compensation that maximizes shareholder value, they will usually lack the information to do so effectively. The CEO, by way of his personnel department, controls much of the information that reaches the committee."); *see also* David I. Walker, *The Manager's Share*, 47 Wm. & Mary L. Rev. 587, 592, 656 (2005) (explaining that "managers have an incentive to camouflage compensation" to limit oversight and market responses and do so through "opaque compensation elements"). Corporate governance experts have expressed similar concerns about the risk of a "management-knowledge captured board." Ann C. Mulé & Charles M. Elson, *A New Kind of Captured Board*, 38 Directors & Boards 27 (2014).

Delaware Supreme Court decisions have recognized the risk that directors laboring in the shadow of a controlling stockholder face a threat of implicit coercion because of the controller's ability to not support the director's re-nomination or re-election, or to take the more aggressive step of removing the director. The two leading cases are *Lynch* and *Tremont II*. In *Lynch,* the Delaware Supreme Court held that entire fairness governed a squeeze-out merger, even if a special committee of independent directors *or* a majority-of-the-minority vote is used, because of the risk that when push came to shove, directors who appeared to be independent and disinterested would favor or defer to the interests and desires of the majority stockholder. 638 A.2d at 1116-17.

> In colloquial terms, the Supreme Court saw the controlling stockholder as the 800–pound gorilla whose urgent hunger for the rest of the bananas is likely to frighten less powerful primates like putatively independent directors who might well have been hand-picked by the gorilla (and who at the very least owed their seats on the board to his support).

*In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002) (Strine, V.C.). In *Tremont II*, the Delaware Supreme Court agreed with Chancellor Allen that the entire fairness framework applied generally to transactions in which a controller extracted non-ratable benefits and not just to squeeze-out mergers. The Delaware Supreme Court explained that the controller's influence created the risk "that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder." *Tremont II*, 694 A.2d at 428. "Entire fairness remains applicable even when an independent committee is utilized because the underlying factors which raise the specter of impropriety can never be completely eradicated and still

require careful judicial scrutiny." *Id.* In other words, there is a risk of coercion. *See*

*Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 502 (Del. Ch. 1990).[10]

---

[10] One consequence that a controller can inflict is to remove the director or decline to support his re-nomination or re-election. That happened here. In another recent case, a controller pressured an outside director into resigning. *See In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *13 (Del. Ch. Aug. 27, 2015). Losing a board seat carries significant financial consequences.

> A director receives a number of benefits from serving on a board. First, a board seat provides direct financial benefits. . . . There are often additional perks and indirect benefits; for example, directors of UAL Corp. (which owns United Airlines) can fly United free of charge . . . . Moreover, a board seat often provides directors with prestige and with valuable business and social connections. . . .

Bebchuk & Fried, *supra*, at 25. There is good reason to think that the loss of a board seat is material. *Id.* ("In most cases, these benefits are likely to be economically significant to the director."); *accord* Walker, *supra*, at 633 (arguing that from an economic perspective, "[t]he incentive to retain a board position generally outweighs the incentive to maximize shareholder value"); *see* Jarrad Harford, *Takeover Bids and Target Directors' Incentives: The Impact of a Bid on Directors' Wealth and Board Seats*, 69 J. Fin. Econs. 51 (2003) (finding statistical evidence that a board seat is difficult to replace, because directors who lose a seat as a result of a takeover can expect to hold one fewer directorship than peers for two years following a completed merger; finding that directors suffer a net financial penalty from the loss of the directorship between zero and -$65,443); David Yermack, *Remuneration, Retention, and Reputation Incentives for Outside Directors*, AFA 2004 San Diego Meetings 2, 29 (Feb. 2003), http://ssrn.com/abstract=329544 (finding "statistically significant evidence that outside directors receive positive performance incentives from compensation, turnover, and opportunities to obtain new board seats" that have a direct impact on the accumulation of wealth by that director and "considering that an outside director may serve on several boards, these incentives appear non-trivial albeit much smaller than those offered to top managers"); *see also* Renée B. Adams & Daniel Ferreira, *Do Directors Perform for Pay?*, 46 J. Acct. & Econ. 154 (2008) (finding statistically significant correlation between director attendance and per meeting fees, indicating that per-meeting payments of approximately $1000 have a material influence on directors). Conversely, being supportive has benefits. Controllers and CEOs have substantial control over the firm resources, and they often have significant influence outside the firm. Bebchuk & Fried, *supra*, at 27-28. One study finds that companies with higher CEO compensation have higher director compensation as well. *See* Ivan E. Brick,

Delaware decisions have not given unqualified support to the ability of outside directors to monitor, oversee, and make judgments regarding the behavior of controlling stockholders. As Chancellor Allen recognized, a controlling stockholder transaction "of course is the context in which the greatest risk of undetectable bias may be present." *Tremont I*, 1996 WL 145452, at \*7. Even in a squeeze-out, where the board typically forms a special committee that hires its own advisors, the men and women who populate the committees are rarely individuals "whose own financial futures depend importantly on getting the best price and, history shows, [they] are sometimes timid, inept, or . . . , well, let's just say worse." *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 619 (Del. Ch. 2005) (Strine, V.C.) (ellipsis in original). This creates a meaningful risk "that the outside directors might be more independent in appearance than in substance." *Id.* Because of concern about the judgment of outside directors in this context, Delaware law requires that the defendant prove that an independent committee was effective, unless the additional protective measure of a disinterested stockholder vote is deployed. *See*, *infra*, Part II.B.4.

Leading scholars contend that judicial review of interested transactions does offer significant benefits, not only to controlled corporations and their stockholders but as a foundational component for vibrant securities markets.

> The legal rules governing private benefits of control in operating a company set the limits on the price of monitoring by a controlling

Oded Palmon & John K. Wald, *CEO Compensation, Director Compensation, and Firm Performance: Evidence of Cronyism?*, 12 J. Corp. Fin. 403 (2006).

shareholder. If these limits are effective, the presence of a controlling shareholder benefits the non-controlling shareholders because the reduction in managerial agency costs will exceed the level of private benefits.

Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Controlling Shareholders*, 152 U. Pa. L. Rev. 785, 786-89 (2003). "A significant body of scholarship links capital market development and public shareholder protection."[11]

Leading scholars also take the position that the same standard of judicial review should apply to the different types of transactions by which controllers can extract non-ratable benefits, and that entire fairness should not be limited to squeeze-out mergers or other transformative transactions. Applying a consistent standard to controlling stockholder transactions reflects the reality that "[m]anagers and controlling shareholders (insiders) can extract (tunnel) wealth from firms using a variety of methods."[12] The

---

[11] *Id.* at 789 (citing sources); *see* Simeon Djankov et al., *The Law and Economics of Self-Dealing*, 88 J. Fin. Econ. 430 (2008) (finding statistically significant correlations between (i) the state of development of a jurisdiction's stock market and its public and private enforcement of self-dealing rules and (ii) the extent of concentrated share ownership and the degree of private enforcement of self-dealing); Rafael La Porta et al., *The Economic Consequences of Legal Origins*, 46 J. Econ. Lit. 285 (2008) (contending that cross-jurisdictional comparisons indicate that strong stockholder rights and protections against self-dealing by controllers lead to more effective and efficient capital markets and financial development); Bernard S. Black, *The Legal and Institutional Preconditions for Strong Securities Markets*, 48 UCLA L. Rev. 781, 804-12 (2001) (identifying protection against controller self-dealing as a pre-requisite for strong securities markets); Simon Johnson et al., *Tunneling*, 90 Am. Econ. Rev. 22, 26 (May 2000) (arguing that the protections provided by the entire fairness standard explain the relative rarity of pyramid ownership structures in the United States).

[12] Vladimir Atanasov, Bernard Black & Conrad S. Ciccotello, *Law and Tunneling*, 37 J. Corp. L. 1, 2 (2011); *accord* Gilson & Gordon, *supra*, at 786-89.

methods can be grouped under three basic headings: cash flow tunneling, asset tunneling, and equity tunneling.

> If one describes a firm as a grove of apple trees, which grow better together than apart, these tunneling techniques can be described as follows: cash flow tunneling can be seen as stealing some of this year's crop of apples; asset tunneling out of the firm involves stealing some of the trees which could potentially make the remaining trees less valuable; and equity tunneling would involve stealing claims to ownership of the grove.

*Law and Tunneling*, *supra,* at 6. The term "stealing" has criminal implications. A more appropriate verb for a civil case would be "wrongfully taking."

Cash flow tunneling "removes a portion of the current year's cash flow, but does not affect the remaining stock of long-term productive assets, and thus does not directly impair the firm's value to all investors, including the controller." *Id.* at 5 (quotation marks omitted). "One major form of cash flow tunneling involves transfer pricing, where the firm either sells output to insiders for below-market prices, or purchases inputs from insiders at above-market prices. The inputs can be either goods or services." *Id.* at 6-7 (footnote omitted). "A second major form is above-market current-year executive salaries, bonuses, or perquisites . . . ." *Id.* at 7. A third example involves "small-scale sales or purchases of replaceable assets at off-market prices." *Id.* "Cash flow tunneling primarily affects the income statement and statement of cash flows and captures the *flow* of firm value." *Id.* at 6. The extraction can be repeated year after year or occur episodically, and the fraction of cash flow extracted can change over time. "Often, cash flow tunneling transactions are not directly with insiders, but instead with firms that the insiders control (or simply have a larger percentage economic ownership than in the

subject firm).” *Id.* at 5. Delaware cases involving claims of cash-flow tunneling include *Nixon*, *Trans World Airlines*, *Monroe County*, *Carlson*, *Harbor Finance*, *Quadrant*, and *Dweck*. *See*, *supra*, Part II.B.2. If proven wrongful, the Challenged Agreements in this case would be a form of cash-flow tunneling.

Asset tunneling involves “the transfer of major long-term (tangible and intangible) assets from ([or] to) the [controlled] firm for less ([or] more) than market value.” *Law and Tunneling*, *supra*, at 5 (quotation marks omitted). “Tangible asset tunneling includes sales (purchases) of significant assets . . . .” *Id.* at 7 (quotation marks omitted). Another form involves investing in an affiliate on terms the affiliate could not obtain from third party sources. “Asset tunneling differs from cash-flow tunneling because the transfer has a permanent effect on the firm’s future cash-generating capacity.” *Id.* at 5. Delaware cases involving claims of asset tunneling include *Tremont, T. Rowe Price*, *MAXXAM*, and *Shandler*. *See*, *supra*, Part II.B.2. The challenges to drop-downs by sponsors of master limited partnerships also involve allegations of asset tunneling. *See, e.g.*, *In re El Paso Pipeline P’rs, L.P. Deriv. Litig.*, 2015 WL 1815846 (Del. Ch. Apr. 20, 2015).

“Equity tunneling increases the controller’s share of the firm’s value, at the expense of minority shareholders, but does not directly change the firm’s productive assets or cash flows.” *Id.* (quotation marks omitted). Examples include dilutive equity offerings, freeze-outs of minority shareholders, and selective repurchases of equity at inflated prices. Delaware cases involving claims of equity tunneling include *Levco*, *Loral*, *New Valley*, *Strassburger*, *Dairy Mart*, and *Flight Options*. *See*, *supra*, Part II.B.2.

Judicial limitations on the methods by which controllers can extract non-ratable benefits "must be determined simultaneously, or at least consistently, because they are in substantial respects substitutes." Gilson & Gordon, *supra*, at 786. If a lower standard of review applies to one type of transaction, such as recurring payments under a consulting agreement, then controllers will use that route to move value. *See* John C. Coates IV, *"Fair Value" As an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions*, 147 U. Pa. L. Rev. 1251, 1329 (1999) (arguing against a ban on freeze-outs because, among other things, controllers likely would shift to and achieve the same results through "substitute forms of self-dealing (either one large or many small transactions)").

Importantly, it is the controller, not the court, who creates the scenario calling for substantive fairness review. If a controller does not want to assume fiduciary obligations, then it can choose not to issue stock to the public, or not to acquire a dominant stake in a publicly funded firm. If a controller wants to use other people's money, it can do so using debt, which establishes a contractual relationship that does not carry fiduciary obligations. Or a controller can use an alternative entity vehicle and eliminate or restrict fiduciary duties. If a controller chooses the corporate form and issues equity, then the controller need not serve as a compensated executive or consultant. Even at that point, the controllers can obtain business judgment review by following *M & F Worldwide*, having a committee approve the compensation arrangement, and then submitting it to the disinterested stockholders for approval at the next annual meeting. Only if the controller

makes choices in a way that invites entire fairness review will that framework come into play.

This decision already has collected some of the many Delaware precedents applying the entire fairness framework to controlling stockholder transactions other than squeeze-out mergers, including compensation arrangements and consulting agreements. *See* Part II.B.2. The *Dolan* opinion did not follow these authorities, choosing instead to follow *Tyson*. This section similarly has collected some of the authorities that undercut the policy arguments that compensation decisions between a corporation and its controlling stockholder are neither significant nor deserving of scrutiny. The literature is vast, many more authorities (pro and con) could be cited, and additional policy arguments also could be raised.[13] Nevertheless, in my view, the weight of these authorities undercut *Tyson*'s and *Dolan*'s persuasiveness.

---

[13] For example, limiting entire fairness review to squeeze-out mergers would reserve a more onerous standard of review for scenarios where other legal and market protections exist (most notably appraisal rights, Rule 13e-3 disclosure requirements, heightened press coverage, and the possibility—however rare—of an alternative transaction), while applying a principle of non-review (the business judgment rule) to scenarios where those protections are absent. Nor, in my opinion, is it persuasive to resort to the sky-will-fall argument that every compensation arrangement will draw a suit. As shown by the Delaware cases cited above, as well as scholarly characterizations of Delaware's regime, the widely held view has been that entire fairness *does* apply to controller compensation agreements, yet the courts have not been overwhelmed with cases. Regardless, the common law works by establishing precedents. It may be necessary to decide some cases, but those precedents in turn will help shape future behavior, including the types of challenges that litigants bring. The reference to precedent in turn suggests the doctrine of *stare decisis* and the policies it serves. The *Dolan* decision appears to have proceeded on the premise that by applying entire fairness it would have "ma[d]e . . . a pronouncement" that would have altered settled law. *See* 2015 WL 4040806, at *16. Given the weight of authority, the noteworthy "pronouncement"

### c.    *Canal*

This leaves *Canal*. That case involved a challenge to an investment services agreement between Canal Capital Corporation, a firm controlled by Asher B. Edelman, and A.B. Edelman Management Co., Inc., another affiliate of Edelman's. 1992 WL 159008, at *1. The plaintiff advanced two duty of care theories and a waste theory, all of which the court rejected. The plaintiffs also advanced a loyalty theory, contending that the services agreement was an interested transaction that benefited Edelman by (i) paying his affiliate excessive fees and (ii) enabling him to use Canal's capital to advance his own interests in other ventures. The company had eight directors; two were Canal officers.

The court commented that it was "not at all clear that the complaint adequately state[d] a claim for breach of the duty of loyalty." *Id.* at *5. Assuming for the sake of argument that it did, the court held that demand was not futile under *Aronson*. The court reasoned that the complaint made only conclusory allegations about the outside directors' ties to Edelman, which were insufficient to call into question the independence of a majority of the board. The court then stated that "[t]he business judgment rule will protect the board's decision unless a majority of the board was interested or disabled by a lack of independence." *Id.* at *6. The decision does not appear to have considered the possibility that entire fairness might apply because the case involved a transaction with a controlling stockholder.

---

was to apply the business judgment rule and limit the entire fairness framework to squeeze-out mergers.

46

The *Canal* decision pre-dated the many more recent Delaware cases that have applied the entire fairness framework to transactions with a controlling stockholder, including services agreements and consulting agreements. Although *Canal* has been cited by subsequent decisions, it does not appear to me that any case has relied on it for the proposition that the business judgment rule applies to a non-ratable transfer to a controlling stockholder. Given the weight of precedent, *Canal* is unpersuasive.

### d. Is *Aronson* Controlling?

At bottom, *Tyson*, *Dolan*, and *Canal* relied on *Aronson* for the proposition that the business judgment rule and not the entire fairness framework provided the standard of review for a transaction in which a controller received non-ratable benefits, at least where the transaction involved compensation or a consulting agreement and was approved by a board or a duly empowered committee with an independent majority of outside directors. Other Delaware Supreme Court cases, particularly *Lynch* and *Tremont II*, have taken a different approach.

There is considerable tension between these lines of authority.[14] The choice between them is both fundamental and consequential, because the scope of a controller's

---

[14] *See In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) (Strine, V.C.) ("Remember that the Delaware case law in this area (that is, the *Lynch* line of jurisprudence) has been premised on the notion that when a controller wants the rest of the shares, the controller's power is so potent that independent directors and minority stockholders cannot freely exercise their judgment, fearing retribution from the controller. For this reason (which is in great tension with other aspects of our law), the jurisprudence has required that such transactions always be subject to fairness review." (footnotes omitted)); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 646 (Del. Ch. 2005) (Strine, V.C.) (contrasting the entire fairness

47

influence has implications for a range of legal doctrines. As *Aronson* demonstrates, it affects demand futility. As *Lynch* and *Tremont II* demonstrate, it affects the substantive standard of review. It also influences how the law treats a controller's take-private tender offer,[15] the degree to which stockholder approval can ratify or change the standard of review for a controlling stockholder transaction,[16] and the availability of the defense of

---

framework with the deference "illustrated by the landmark decision in *Aronson v. Lewis,* which presumes that independent directors can impartially decide whether to cause the company to sue a controlling stockholder" (footnote omitted)); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 548 (Del. Ch. 2003) (Strine, V.C.) ("The rationale for [the entire fairness standard and *Lynch*] is that the potential power of the controlling stockholder to act in ways that are detrimental to independent directors and unaffiliated stockholders is supposedly so formidable that the law's prohibition of retributive action and unfair self-dealing is insufficient to render either independent director or independent stockholder approval a reliable guarantee of fairness."); *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 436 n.17 (Del. Ch. 2002) (Strine, V.C.) ("In this regard, *Lynch* is premised on a less trusting view of independent directors than is reflected in the important case of *Aronson v. Lewis . . .* , which presumed that a majority of independent directors can impartially decide whether to sue a controlling stockholder."); Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499, 510 (2002) ("In the *Tremont* and *Emerald Partners* cases, the *Lynch* doctrine was arguably extended from the unique context of a going private transaction to address any transaction involving a controlling stockholder, on the one side, and another controlled corporation, on the other. This arguable extension occurred without discussion of whether a transaction potentially less important to a majority stockholder (such as the sale of a modest-sized asset) should be subject to the same rules as a squeeze-out merger. It is this potential extension that causes the most direct doctrinal tension with *Aronson*.").

[15] *See In re CNX Gas Corp. S'holders Litig.*, 2010 WL 2705147, at *5-8 (Del. Ch. July 5, 2010*); Cox Commc'ns*, 879 A.2d at 614-24, 642-48; *Pure Res.*, 808 A.2d at 435-46; Gilson & Gordon, *supra*, at 706-803, 805-27.

[16] *See, e.g.*, *PNB Hldg.*, 2006 WL 2403999, at *14 n.71 ("In the context of a going private transaction with a controlling stockholder, there are reasons why the simple fact that a majority of the disinterested electorate votes yes on a merger might be deemed insufficient to be given ratification effect."); *In re JCC Hldg. Co., Inc.*, 843 A.2d 713,

acquiescence.[17] The issue potentially affected the extent to which a director could invoke

an exculpatory provision to obtain dismissal of a complaint, an issue that the Delaware

---

723 (Del. Ch. 2003) (Strine, V.C.) ("This inherent coercion [of a controlling stockholder] is thought to undermine the fairness-guaranteeing effect of a majority-of-the-minority vote condition because coerced fear or a hopeless acceptance of a dominant power's will, rather than rational self-interest, is deemed likely to be the animating force behind the minority's decision to approve the merger."); *In re Wheelabrator Techs., Inc. S'holders Litig.*, 663 A.2d 1194, 1203 (Del. Ch. 1995) ("[W]here the merger [between a controlling stockholder and its subsidiary] is conditioned upon approval by a 'majority of the minority' stockholder vote, and such approval is granted, the standard of review remains entire fairness, but the burden of demonstrating that the merger was unfair shifts to the plaintiff."); *Rabkin v. Olin Corp.*, 1990 WL 47648, at *6 (Del. Ch. Apr. 17, 1990) ("If an informed vote of a majority of the minority shareholders has approved a challenged transaction, and in fact the merger is contingent on such approval, the burden entirely shifts to the plaintiffs to show that the transaction was unfair to the minority."), *aff'd*, 586 A.2d 1202 (Del. 1990) (TABLE); J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1461 (2014) ("Because the controller's influence operates at both the board and stockholder levels, neither a special committee nor a majority-of-the-minority vote, standing alone, is sufficient to sterilize the controller's influence and reestablish the presence of a qualified decision maker.").

[17] *JCC Hldg.*, 843 A.2d at 716 ("As a logical consequence, our law cannot . . . coherently say that minority stockholders 'acquiesce' in the fairness of a merger with a controlling stockholder merely by voting yes or accepting the merger consideration. Rather, those actions simply have the effect of waiving any right to an appraisal remedy; they do not bar participation in an equitable challenge to the merger under the plaintiff-favorable fairness standard set forth in *Lynch*."); *Clements v. Rogers*, 790 A.2d 1222, 1238 (Del. Ch. 2001) (Strine, V.C.) (noting that because the premise of *Lynch* was to address the coercive effect of a controlling stockholder's presence, "it would be somewhat paradoxical to hold that a stockholder who simply accepted the transactional consideration in a squeeze-out merger . . . is barred from challenging that transaction solely because she had already concluded the transaction was unfair"); *In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057, 1082 (Del. Ch. 2001) ("Majority shareholders who elect to freeze out minority shareholders should not be made better off by choosing to forego protective structural mechanisms. . . . [A]cquiescence (or ratification *implied* from the actions of shareholders) should not be given greater force than explicit ratification. It would be anomalous, to say the least, to extinguish equitable claims based on implied approval (or acquiescence) when such claims are not extinguished by explicit approval (or ratification).").

Supreme Court has now clarified. *See In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173 (Del. 2015).

Read literally, the *Aronson* decision limited its analysis to the issue of demand futility. 473 A.2d at 814. The crux of *Aronson*'s holding was to reinforce the requirement that a plaintiff allege particular facts that would call into question the ability of the board to consider a demand. In the words of a leading scholar, "[e]mphasis upon this principle seems to have been taken to extreme lengths by the Delaware Supreme Court in *Aronson v. Lewis*." Robert C. Clark, *Corporate Law* 643 (1986).

The plaintiff in *Aronson* sought to recover on behalf of Meyers Parking Systems, Inc. for harm that the entity allegedly suffered due to generous compensation arrangements that the board approved for an insider and 47% stockholder, Leo Fink. The Delaware Supreme Court described the underlying transactions as follows:

> On January 1, 1981, the defendants approved an employment agreement between Meyers and Fink for a five year term with provision for automatic renewal each year thereafter, indefinitely. Meyers agreed to pay Fink $150,000 per year, plus a bonus of 5% of its pre-tax profits over $2,400,000. Fink could terminate the contract at any time, but Meyers could do so only upon six months' notice. At termination, Fink was to become a consultant to Meyers and be paid $150,000 per year for the first three years, $125,000 for the next three years, and $100,000 thereafter for life. Death benefits were also included. Fink agreed to devote his best efforts and substantially his entire business time to advancing Meyers' interests. The agreement also provided that Fink's compensation was not to be affected by any inability to perform services on Meyers' behalf. Fink was 75 years old when his employment agreement with Meyers was approved by the directors. There is no claim that he was, or is, in poor health.
>
> Additionally, the Meyers board approved and made interest-free loans to Fink totalling $225,000. These loans were unpaid and outstanding as of

50

> August 1982 when the complaint was filed. At oral argument defendants' counsel represented that these loans had been repaid in full.

473 A.2d at 808-09. The plaintiff contended that demand was futile because Fink dominated and controlled the board. The plaintiff based this allegation on

> (1) Fink's 47% ownership of Meyers' outstanding stock, and (2) that he "personally selected" each Meyers director. Plaintiff also alleges that mere approval of the employment agreement illustrates Fink's domination and control of the board. In addition, plaintiff argued on appeal that 47% stock ownership, though less than a majority, constituted control given the large number of shares outstanding . . . .

*Id.* at 815.

By rejecting these arguments, *Aronson* marked a sea change in Delaware law. On the question of whether demand was futile when a board would have to sue over a transaction involving a controlling stockholder, the case departed from longstanding precedent, such as *McKee v. Rogers*, 156 A. 191 (Del. Ch. 1931) (Wolcott, C.). The same was true for *Aronson*'s treatment of the ability of directors who participated in the challenged decision to consider a demand, which departed from cases such as *Fleer v. Frank H. Fleer Corp.*, 125 A. 411 (Del. Ch. 1924) (Wolcott, C.), and *Miller v. Loft, Inc.*, 153 A. 861 (Del. Ch. 1931) (Wolcott, C.). Other pre-*Aronson* precedents consistent with *McKee*, *Fleer*, and *Miller* could be cited. After describing the *Aronson* court's conclusion that the complaint has not pled sufficient facts to raise a reasonable doubt about demand, Professor Clark commented that "the court might be argued to have blinded itself to reality." Clark, *supra*, at 643.

Why the big shift? The historical context suggests that *Aronson* may have been a reaction to the contretemps over *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981).

51

Many commentators had responded to *Zapata* by expressing fear that it undermined the

business judgment rule.[18] The *Aronson* decision provided an opportunity to settle matters.

---

[18] *See* Clark, *supra*, at 647-48 (describing debate over *Zapata*); Irwin Borowski, *Corporate Accountability: The Role of the Independent Director*, 9 J. Corp. L. 455, 466 (1984) ("In 1981, however, the Delaware Supreme Court, in *Zapata Corp. v. Maldonado*, surprised almost everybody by requiring an independent judicial review in which the court applies its own independent business judgment to the allegations in order to determine whether the suit should be allowed to continue. The *Zapata* decision aroused a storm of controversy with numerous articles being written in its aftermath." (footnotes omitted)). The volume and range of the responses anticipated the reactions to the Delaware Supreme Court's decisions in *Unocal* and *Revlon*, as well as to the Court of Chancery's meaningful application of enhanced scrutiny in cases such as *City Capital Associates v. Interco, Inc.*, 551 A.2d 787 (Del. Ch. 1988) (Allen, C.); *Grand Metropolitan, PLC v. Pillsbury Co.*, 558 A.2d 1049 (Del. Ch. 1988); and *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103 (Del. Ch. 1986) (Allen, C.). Today, the latter debates are perhaps better remembered.

To provide a sense of the magnitude of the post-*Zapata* furor, a search of Westlaw identifies thirty-eight post-*Zapata*, pre-*Aronson* law review articles, notes, and comments that discuss to varying degrees the implications of *Zapata* for the business judgment rule. A search of HeinOnline reveals approximately ninety-nine during a similar period. For examples of leading commentators who offered strong criticisms of *Zapata*, see Daniel R. Fischel, *The "Race to the Bottom" Revisited: Reflections on Recent Developments in Delaware's Corporation Law*, 76 Nw. U. L. Rev. 913, 937 (1982) ("The most significant, and most unsettling, aspect of *Zapata* is the court's explicit rejection of the business judgment rule as the proper standard for determining whether a derivative suit can be dismissed."); Dennis J. Block & H. Adam Prussin, *The Business Judgment Rule and Shareholder Derivative Actions:* Viva Zapata?, 37 Bus. Law. 28, 60 (1981) (criticizing the *Zapata* decision for adopting a new test "which had never before been advocated or followed, by any court" and for having "abandoned any pretext that the 'business judgment rule' has anything much to do with its analysis"); *id.* at 63 (objecting to *Zapata* as "judicial legislation," "virtually unsupportable," and "a serious misstep"). Others supported the ruling or thought it did not go far enough. *See, e.g.*, James D. Cox, *Searching for the Corporation's Voice in Derivative Suit Litigation: A Critique of Zapata and the ALI Project*, 1982 Duke L.J. 959, 975 ("Unfortunately, although the court held that the business judgment rule is an inappropriate standard of review, the two-tiered analysis it offered in its place provides only an illusory improvement."); John C. Coffee, Jr., *The Survival of the Derivative Suit: An Evaluation and A Proposal for Legislative Reform*, 81 Colum. L. Rev. 261, 330 (1981) ("On its own terms, the *Zapata* decision

The high court accepted an interlocutory appeal from the denial of a Rule 23.1 motion, something noteworthy in itself at the time. The court also specifically noted that "[t]he gap in our law, which we address today, arises from this Court's decision in [*Zapata*]," and it devoted a full paragraph to stressing *Zapata*'s recognition of the board's authority over derivative actions. *Aronson*, 473 A.2d at 813. The *Aronson* decision also described a post-*Zapata* uptick in derivative suits asserting demand futility:

> After *Zapata* numerous derivative suits were filed without prior demand upon boards of directors. The complaints in such actions all alleged that demand was excused because of board interest, approval or acquiescence in the wrongdoing. In any event, the *Zapata* demand-excused/demand-refused bifurcation, has left a crucial issue unanswered: when is demand futile and, therefore, excused?

*Id.* at 813-14. It was in this context that *Aronson* sought to reinforce the bulwark of Rule 23.1 as a pleading-stage limitation on weak derivative claims.

To place the decision in context is not to question its legitimacy. The choice to raise the bar for pleading demand futility was undoubtedly the type of public policy judgment that the Delaware Supreme Court was and is empowered to make. The *Aronson* court openly made at least one other public policy judgment. It held that demand would not be futile as long as the board had a majority of disinterested and independent directors. 473 A.2d at 815. The high court explained its rationale as follows:

---

deserves recognition as a serious effort at judicial statesmanship by the Delaware Supreme Court—but one that needs legislative codification and embroidery.").

The *Aronson* decision did not settle the debate. A search of HeinOnline indicates that during a comparable three-year period after *Aronson*, there were another seventy-seven articles, notes, and comments that touched on that decision and *Zapata*.

> We recognize that drawing the line at a majority of the board may be an arguably arbitrary dividing point. Critics will charge that we are ignoring the structural bias common to corporate boards throughout America, as well as the other unseen socialization processes cutting against independent discussion and decisionmaking in the boardroom. The difficulty with structural bias in a demand futile case is simply one of establishing it in the complaint for purposes of Rule 23.1. We are satisfied that discretionary review by the Court of Chancery of complaints alleging specific facts pointing to bias on a particular board will be sufficient for determining demand futility.

*Id.* at 815 n.8.

What is not clear to me is the extent to which the Delaware Supreme Court's policy judgments about the demand futility context were intended to extend to the substantive law that would apply if demand was excused or if the claim was direct. Nor is it clear to me the degree to which those assessments were intended to persist in crystallized form, immune to further common law development. There have been significant developments since *Aronson*.

As noted above, the *Aronson* decision appears to have responded most directly to practitioner concern about the reasonableness analysis in the second prong of *Zapata*'s test for reviewing a special litigation committee's decision to dismiss a derivative action, a test which marked the Delaware Supreme Court's first deployment of something akin to the two-step standard of review that later emerged as enhanced scrutiny.[19] *Aronson* pre-

---

[19] *See Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1997 WL 305829, at *13 (Del. Ch. May 30, 1997) (Allen, C.) ("[T]he second prong of the *Zapata* test requires that this court exercise its own business judgment with respect to the reasonableness of the settlement"); *see also Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2013 WL 458373, at *2 (Del. Ch. Feb. 6, 2013) (discussing range of reasonableness inquiry); Kenneth B. Davis, Jr., *Structural Bias, Special Litigation Committees, and the Vagaries of Director*

dated both *Unocal* and *Revlon*, as well as over three decades during which the Delaware

courts have demonstrated that reasonableness review under enhanced scrutiny "is not a

license for law-trained courts to second-guess reasonable, but debatable, tactical choices

that directors have made in good faith."[20]

The *Aronson* decision also pre-dated further development in the law governing

controlling stockholder transactions, both in terms of decisions addressing the standard of

review, *see* Part II.B.3.a, *supra*, and the degree to which applying entire fairness leads to

---

*Independence*, 90 Iowa L.Rev. 1305, 1360 (2005) ("[T]he court's review, as contemplated [by *Zapata*], is of the reasonableness of the SLC's business judgment rather than the substitution of its own."). On *Zapata* as an initial version of enhanced scrutiny, see *Louisiana Mun. Police Emps. Ret. Sys. v. Morgan Stanley & Co., Inc.*, 2011 WL 773316, at *7 (Del. Ch. Mar. 4, 2011) ("An SLC's decision to dismiss a post-demand-excusal derivative claim is reviewed under *Zapata*'s two-step standard, which effectively amounts to reasonableness review and a context-specific application of enhanced scrutiny."); Julian Velasco, *Structural Bias and the Need for Substantive Review*, 82 Wash. U. L.Q. 821, 849 (2004) (explaining that *Zapata* "is quite similar to *Unocal*"); Gregory V. Varallo *et al.*, *From* Kahn *to* Carlton*: Recent Developments in Special Committee Practice*, 53 Bus. Law. 397, 423 n.121 (1998) ("The [*Zapata*] standard is also reminiscent of the enhanced scrutiny courts use to examine the actions of directors engaged in a sale of a corporation or other like transactions.... Perhaps the similarity ... is best explained by the fact that in all of these situations courts would like to defer to the business judgment of a board, but because the scenarios in which these cases arise create a potential conflict of interest for board members, the court is only willing to do so if a board first demonstrates it is capable of making an independent business judgment and the judgment seems at least to make some rational sense.").

[20] *In re Toys "R" Us, Inc. S'holders Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005) (Strine, V.C.); *accord Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45-46 (Del. 1994) ("If a board selected one of several reasonable alternatives, a court should not second guess that choice even though it might have decided otherwise.... [C]ourts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness."). *See generally C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' Ret. Tr.*, 107 A.3d 1049, 1067-71 (Del. 2014).

a finding of liability. On the latter point, experience since *Aronson* has shown that the application of entire fairness is not outcome-determinative and that defendants prevail under this standard of review with some degree of frequency.[21]

---

[21] *See* Bernard S. Sharfman, Kahn v. M&F Worldwide Corporation: *A Small but Significant Step Forward in the War Against Frivolous Shareholder Lawsuits*, 40 J. Corp. L. 197, 203 (2014) (collecting cases and explaining that under entire fairness, "even if fair dealing were absent, that finding would not necessarily be outcome determinative"); Reza Dibadj, *Networks of Fairness Review in Corporate Law*, 45 San Diego L. Rev. 1, 22 (2008) ("While the conventional wisdom might suggest that standards of review are typically outcome determinative, the empirical research suggests the fairness standard is not . . . ." (footnote omitted)); Guhan Subramanian, *Fixing Freezeouts*, 115 Yale L.J. 2, 15 n.63 (2005) ("[E]ntire fairness review would not be outcome determinative."); Julian Velasco, *A Defense of the Corporate Law Duty of Care*, 40 J. Corp. L. 647, 689 (2015) (collecting cases where defendants have prevailed under entire fairness and noting that "[o]nce applied, the entire fairness test is no longer considered outcome-determinative"); Julian Velasco, *How Many Fiduciary Duties Are There in Corporate Law?*, 83 S. Cal. L. Rev. 1231, 1242 (2010) ("[T]he entire fairness test is not quite as demanding as could be imagined. It is not actually outcome-determinative."); Jeffrey J. Clark, Comment, Kahn v. Lynch Communication Systems, Inc.*: A Major Step Toward Clarifying the Role of Independent Committees*, 20 Del. J. Corp. L. 564, 565 n.11 (1995) (expressing skepticism that entire fairness is outcome determinative by citing two cases where defendants met the entire fairness standard). For illustrative cases where the defendants prevailed, after trial, under the entire fairness standard of review, see *Kahn v. Lynch Commc'n Sys., Inc.*, 669 A.2d 79 (Del. 1995); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del. 1995); *Nixon v. Blackwell*, 626 A.2d 1366 (Del. 1993); *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929 (Del. 1985); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013); *Zimmerman v. Crothall*, 62 A.3d 676 (Del. Ch. 2013); *S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007 (Del. Ch. Mar. 9, 2011), *aff'd* 35 A.3d 419 (Del. 2011); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2011 WL 227634 (Del. Ch. Jan. 14, 2011); *Hanover Direct, Inc. S'holders Litig.,* 2010 WL 3959399 (Del. Ch. Sept. 24, 2010); *Kates v. Beard Research, Inc.*, 2010 WL 1644176 (Del. Ch. Apr. 23, 2010); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531 (Del. Ch. 2003) (Strine, V.C.); *Emerald P'rs v. Berlin*, 2003 WL 21003437 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003); *Liberis v. Europa Cruises Corp.*, 1996 WL 73567 (Del. Ch. Feb. 8, 1996), *aff'd*, 702 A.2d 926 (Del. 1997); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303 (Del. Ch. Mar. 7, 1991); *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490 (Del. Ch. 1990); *Rabkin v. Olin Corp.*, 1990 WL 47648 (Del. Ch. Apr. 17, 1990), *aff'd,* 586 A.2d 1202 (Del. 1990); *Shamrock Hldgs., Inc. v. Polaroid Corp.*, 559 A.2d 257 (Del. Ch. 1989); *see*

In my view, the subsequent evolution of the law undermines the case for extending *Aronson* beyond the demand-excusal contest. Indeed, given how Delaware law has evolved since 1984, there is even reason to think that demand futility could operate in a more nuanced fashion that does not discount entirely the involvement of a controlling stockholder. There are decisional hints that in its pure form, *Aronson* is counter-intuitive. The second prong of *Aronson*, for example, contemplates that demand is futile if the transaction is not otherwise governed by the business judgment rule. *Aronson*, 473 A.2d at 815. After *Tremont II* and *Lynch*, one might think that demand would be futile for a transaction that was subject to entire fairness *ab initio*. Writing as a Vice Chancellor, Chief Justice Strine once said as much, commenting that demand would be futile for transactions involving a majority stockholder that were governed by the entire fairness standard.[22] Since then, Chancellor Bouchard has trenchantly analyzed *Aronson* and

---

*also Kleinhandler v. Borgia*, 1989 WL 76299 (Del. Ch. July 7, 1989) (summary judgment). In other cases, the court has held after trial that the challenged transaction was not entirely fair, but that the plaintiffs had not suffered any transactional damages. *See William Penn P'ship v. Saliba*, 13 A.3d 749 (Del. 2011); *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261 (Del. Ch. Sept. 4, 2014); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127 (Del. Ch. Sept. 4, 2014); *Oliver v. Bos. Univ.*, 2006 WL 1064169 (Del. Ch. Apr. 14, 2006).

[22] *See Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1231 n.47 (Del. Ch. 2001) ("The complaint pleads particularized facts that suggest that the entire fairness standard of review—rather than the business judgment rule—would apply to the Transactions and that the Transactions might not have been fair. As a result, the complaint satisfies the second prong of *Aronson*."), *rev'd on other grounds*, 794 A.2d 1211 (Del. 2002). I made a similar comment in an oral ruling, which Treppel cited during briefing. *Montgomery v. Erickson Air-Crane, Inc,* C.A. No. 8784-VCL (Del. Ch. Apr. 15, 2014) (TRANSCRIPT).

concluded that to find demand excused because entire fairness applies *ab initio* would be inconsistent with how the Delaware Supreme Court approached the transactions between Fink and Meyers that were at issue in that decision. *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 2015 WL 4192107 (Del. Ch. July 13, 2015). I agree, but this serves to highlight the tension between *Aronson* and other Delaware doctrines.

Another example of how far Delaware law has evolved post-*Aronson* is demand futility for *Unocal* claims. As then-Vice Chancellor Strine explained, there are powerful reasons to debate whether and when *Unocal* claims should be characterized as derivative. *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 75-85 (Del. Ch. 1999). Ultimately, however, the derivative-individual distinction is "of no practical importance" because "[s]o long as the plaintiff states a claim implicating the heightened scrutiny required by *Unocal*, demand has been excused under the [*Aronson*] demand excusal test."[23] The reason is that in situations triggering enhanced scrutiny under *Unocal*, there

---

[23] *Id.* at 81. As support, the Chief Justice cited the following precedents: *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1189 (Del. Ch. 1998) ("Even if the claims were regarded as derivative, the complaint's entrenchment allegations are sufficient to excuse compliance with the demand requirement."); *Wells Fargo & Co. v. First Interstate Bancorp*, 1996 WL 32169, at *8 (Del. Ch. Jan. 18, 1996) (Allen, C.) ("With respect to the entrenchment claim, it seems clear that factual allegations which, if true, are sufficient to shift the burden to defendants to meet the 'enhanced business judgment' test of *Unocal* are similarly sufficient to raise a reasonable doubt concerning the board's ability to make a binding business judgment, whether one focuses on a judgment to resist the Wells Fargo offer or on the hypothetical judgment that this board would make if asked to institute this law suit."); *In re Chrysler Corp. S'holders Litig.*, 1992 WL 181024, at *4-5 (Del. Ch. July 27, 1992) (holding that directors' decision to lower rights plan trigger created sufficient inference of entrenchment to excuse demand); *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del. Ch.) ("In my view, the plaintiffs' complaints, which set forth particularized facts alleging that the Rights Plan deters *all* hostile

is an "omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders." *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del. 1985). One might think that if the omnipresent specter is enough to excuse demand, then excusal would follow more readily when directors must confront a dominant stockholder who will continue in control of the entity and enjoys both the hard and soft power to engage in potentially blatant, but more likely subtle acts of retribution.[24]

As these examples illustrate, the rulings in *Aronson*—at least in their pure form—stand out amidst other Delaware decisions. Personally, therefore, I would continue to limit *Aronson*'s scope to demand futility, and I would fold its teachings in that area into the more holistic approach contemplated by *Delaware County Employees Retirement Fund v. Sanchez*, 124 A.3d 1017 (Del. 2015). I would not use *Aronson* as a springboard for cutting back on post-*Aronson* case law governing entire fairness transactions. But that is the view of just one trial court judge. Ultimately, the choice between *Aronson* and other precedents is something only the Delaware Supreme Court can resolve. If the

---

takeover attempts through its limitation on alienability of shares and the exercise of proxy rights, sufficiently pleads a primary purpose to retain control, and thus casts a reasonable doubt as to the disinterestedness and independence of the board at this stage of the proceedings."), *aff'd*, 500 A.2d 1346 (Del. 1985).

[24] For incumbent directors the implications of taking action in the controlling stockholder context run in the opposite direction from the takeover context. In the latter setting, the directors preserve their incumbency and align themselves with management by doing something, *viz.* by adopting defensive measures. In the former setting, directors preserve their positions and align themselves with the controller by not doing something, *viz.* by not initiating litigation.

Delaware Supreme Court chooses to apply *Aronson* more broadly and limit the substantive application of the entire fairness framework, then its ruling obviously will control. Absent further guidance from the high court, however, this decision hews to the weight of precedent regarding how Delaware law approaches transactions in which a controlling stockholder receives a non-ratable benefit.

### 4.    Entire Fairness With A Potential Burden Shift

Based on the foregoing analysis, the operative standard of review for the Challenged Agreements is entire fairness, with the involvement of the Audit Committee operating potentially as a basis for shifting the burden of proof to the plaintiff. Under this standard, the Complaint states a claim for breach of fiduciary duty.

The Complaint supports a reasonable inference that the Challenged Agreements were not entirely fair and represented a means by which Cohen extracted a non-ratable return from EZCORP. Factors that support this inference include:

- The capital structure of the company, in which Cohen owns high-vote shares that allow him to control EZCORP with only 5.5% of its equity, creating a disincentive for paying dividends and a strong incentive to obtain returns through direct transfers.

- The long history of advisory services agreements between EZCORP and entities affiliated with Cohen.

- The amount and timing of the payments, which involved a regular, monthly payment stream that increased steadily over time.

- The magnitude of the payments each year, which were comparable in amount to what EZCORP otherwise might have paid as a dividend.

- The minimal resources of Madison Park and its lack of any other publicly traded clients.

- The duplication between the services Madison Park agreed to provide and the capabilities and expertise of EZCORP's management team.

- The fact that none of EZCORP's peer companies employed a similar consulting firm.

- The decision by Beal and Love to cancel the 2013 Renewal.

- Cohen's retaliation against Beal and Love for cancelling the 2013 Renewal.

The defendants correctly observe that in the abstract, there is nothing wrong about a public company hiring a consulting firm to provide services. It may well be shown at a later stage of the case that hiring Madison Park was appropriate here. For pleading purposes, however, it is reasonably conceivable that the Challenged Agreements were a form of tunneling.

The Complaint adequately pleads for purposes of a motion to dismiss that the terms of the Challenged Agreements were unfair and that EZCORP suffered harm. Allegations regarding damages can be pled generally. The Complaint details the fees paid to Madison Park and explains why they were both unnecessary and excessive when compared to EZCORP's revenue and income

At the pleading stage, the involvement of the Audit Committee does not defeat the breach of fiduciary duty claim. When a transaction involving self-dealing by a controlling shareholder is challenged, unless the corporation deploys both an independent committee and a majority-of-the-minority vote, then the most that the use of the committee can achieve is a shift in the burden of proof. The defendants can achieve that result only if they have a "well functioning" committee of independent directors. *See In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 789 (Del. Ch. 2011) (Strine, C.), *aff'd*

*sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012). Determining whether a committee of independent directors is effective is a "fact-intensive inquiry." *Krasner v. Moffett*, 826 A.2d 277, 285-86 (Del. 2003). Shifting the burden of proof at the pleading stage "will normally be impossible" because defendants do not have the luxury of arguing facts that would counter the plaintiffs' well-pled allegations that are assumed as true. *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002). In short, "a motion to dismiss is not the proper vehicle for deciding whether the burden of proof under entire fairness should be shifted."[25]

Count I states a claim for breach of fiduciary duty against Cohen, MS Pawn, and Roberts. The Rule 12(b)(6) motion is denied as to Count I.

## C.    Count II: Waste

Count I of the Complaint alleges that by entering into the Challenged Agreements and making the payments they contemplated, the defendants engaged in waste. According to the Complaint, "the terms of the [Challenged Agreements] constitute an exchange of corporate assets for consideration so disproportionately small as to lie

---

[25] *Frank v. Elgamal*, 2012 WL 1096090, at *10 (Del. Ch. Mar. 30, 2012); *accord Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *12, *14 (Del. Ch. May 7, 2014) ("The possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6) unless the alleged controlling stockholder is able to show, conclusively, that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it. . . . [T]he Court is presently unable to conclude that the Special Committee was sufficiently 'well functioning' as to shift the burden of proof under the entire fairness standard, to the extent it may apply, to the Plaintiff.").

beyond the range at which any reasonable person might be willing to trade or conduct a business transaction." Compl. ¶ 95.

"The pleading burden on a plaintiff attacking a corporate transaction as wasteful is necessarily higher than that of a plaintiff challenging a transaction as 'unfair' as a result of the directors' conflicted loyalties. . . ." *Harbor Fin. P'rs v. Huizenga,* 751 A.2d 879, 892 (Del. Ch. 1999) (Strine, V.C.). For a waste claim to survive a motion to dismiss, a plaintiff must show "economic terms so one-sided as to create an inference that no person acting in a good faith pursuit of the corporation's interests could have approved the terms." *Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007) (Strine, V.C.).

In *Quadrant Structured Products Co. v. Vertin*, 102 A.3d 155 (Del. Ch. 2014), this court confronted a similar situation in which the plaintiff alleged that the director defendants had caused the company to transfer value preferentially to the company's controlling entity by paying excessive service and licensing fees. The court held that while improbable, it was conceivable that the "excessive fees could fall so far beyond market standards as to amount to waste." *Id.* at 193. The same outcome is possible here.

As a practical matter, it is unlikely that waste will be a relevant theory of relief. If the Complaint's waste theory is correct, then it will mean that the terms of the Challenged Agreements were unfair and constituted a breach of fiduciary duty. This makes the waste theory somewhat redundant. Nevertheless, as a strict pleading matter, the waste claim can proceed. *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 139 (Del. Ch. 2009).

## D.  Count III: Aiding And Abetting

Count III attempts to impose liability on Cohen and MS Pawn for aiding and abetting the Director Defendants' breaches of fiduciary duty. A claim for aiding and abetting has four elements: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in the breach, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (quotation marks and formatting omitted).

For reasons discussed previously, I believe that the proper claim for pursuing Cohen is for breach of his duties as a controller. As a general rule, "[i]f a defendant has acted in a fiduciary capacity, then that defendant is liable as a fiduciary and not for aiding and abetting." *Quadrant*, 102 A.3d at 203. Count III is dismissed as to Cohen.

The claim against MS Pawn for aiding and abetting is well pled. Although I have posited that a breach of fiduciary duty claim provides the more straightforward way of reaching MS Pawn, Delaware authority supports the proposition that the entity through which the ultimate controller exercises control can be sued alternatively as an aider and abetter of the ultimate controller's breach. *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at * 38 (Del. Ch. May 3, 2004). The Complaint permissibly pleads these theories in the alternative. Ch. Ct. R. 8(e).

## E.  Count IV: Unjust Enrichment

Count IV asserts an unjust enrichment claim. Count IV presumes the existence of a breach of fiduciary duty or a finding of waste and posits that under those circumstances, Madison Park and Cohen were unjustly enriched in the amount of the fees they received

under the Challenged Agreements. In either scenario, a remedy would lie for breach of fiduciary duty or waste. The unjust enrichment count adds nothing.

Alternatively, if there is no underlying breach of fiduciary duty or finding of waste, then the Challenged Agreements are valid. "This Court routinely dismisses unjust enrichment claims that are premised on an express, enforceable contract that controls the parties' relationship because damages is an available remedy at law for breach of contract." *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *19 (Del. Ch. Sept. 18, 2014) (quotation marks omitted).

Based on these alternatives, it is not reasonably conceivable that Cohen and Madison Park could be liable for Count IV under circumstances when they would not also be liable under Counts I and III. Count IV is dismissed.

## III.    THE RULE 23.1 ANALYSIS

For this decision to have recognized that EZCORP possesses a viable claim does not mean that Treppel necessarily can assert it. When a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved. *See* 8 *Del. C.* § 141(a). "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson*, 473 A.2d at 811. "Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." *Zapata*, 430 A.2d at 782 (footnote omitted). Section 141(a) vests

65

statutory authority in the board of directors to determine what action the corporation will take with its litigation assets, just as with other corporate assets. *Id.*

In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim.[26] A stockholder whose litigation efforts are opposed by the corporation can accomplish this feat only by obtaining a judicial ruling establishing demand excusal or wrongful refusal.

> Because directors are empowered to manage, or direct the management of, the business and affairs of the corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim *and* they have wrongfully refused to do so *or* where demand is excused because the directors are incapable of making an impartial decision regarding such litigation.[27]

---

[26] *Aronson*, 473 A.2d at 811; *see also Desimone v. Barrows*, 924 A.2d 908, 914 (Del. Ch. 2007) (Strine, V.C.) (noting that the issue for a Rule 23.1 motion is "whether the . . . board should be divested of its authority to address [the underlying] misconduct").

[27] *Rales v. Blasband,* 634 A.2d 927, 932 (Del. 1993) (emphases added; citation omitted); *accord Wood v. Baum,* 953 A.2d 136, 140 (Del. 2008) ("A stockholder may not pursue a derivative suit to assert a claim of the corporation unless the stockholder: (a) has first demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so; or (b) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation."); *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 730 (Del. 1988) ("The right to bring a derivative action does not come into existence until the plaintiff shareholder has made a demand on the corporation to institute such an action or until the shareholder has demonstrated that demand would be futile."); *Ainscow v. Sanitary Co. of Am.,* 180 A. 614, 615 (Del. Ch. 1935) (Wolcott, C.) ("[A] stockholder has no right to file a bill in the corporation's behalf unless he has first made demand on the corporation that it bring the suit and the demand has been answered by a refusal, or unless the circumstances are such that because of the relation of the responsible officers of the corporation to the alleged wrongs, a demand would be obviously futile. . . .").

Treppel did not make a litigation demand, and the Board opposes his efforts to pursue litigation. Consequently, he can gain authority to litigate EZCORP's claims only by establishing that demand was excused as futile.

The demand requirement "is a basic principle of corporate governance and is a matter of substantive law."[28] Rule 23.1 is the "procedural embodiment of this substantive principle."[29] Rule 23.1 implements the demand requirement procedurally by requiring that a derivative plaintiff "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Ct. Ch. R. 23.1. Through this procedural mechanism, Rule 23.1 enables courts to apply the substantive law of demand doctrine at the pleading stage, rather than deferring the issues until later in the case.

---

[28] *Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) (quotation marks omitted); *accord Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96-97 (1991) ("[T]he function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure.'"); *Braddock v. Zimmerman*, 906 A.2d 776, 784 (Del. 2006) ("The demand requirement of Rule 23.1 is a substantive right . . . ." (quotation marks omitted)); *Ainscow*, 180 A. at 615 ("The question of whether a stockholder may act as a volunteer in taking up the cudgels in behalf of his corporation . . . is one of his right and authority to act.").

[29] *Rales*, 634 A.2d at 932. Rule 23.1 cannot create a substantive legal doctrine on its own. *See* 10 *Del. C.* § 361(b) ("[R]ules shall be for the purpose of securing the just and, so far as possible, the speedy and inexpensive determination of every such proceeding. The rules shall not abridge, enlarge or modify any substantive right of any party.").

A board can consider a demand properly, and a plaintiff therefore can seek to "obtain the action he desires from the directors," if a majority of the directors can exercise their independent and disinterested business judgment about whether to pursue litigation. *Aronson*, 473 A.2d at 808 n.1. Conversely, demand is futile when "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934.

The "reasonable doubt" standard is not intended to incorporate "a concept normally present in criminal prosecution." *Grimes*, 673 A.2d at 1217. "Reasonable doubt can be said to mean that there is a reason to doubt." *Id.* "Stated obversely, the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule. The concept of reasonable belief is an objective test . . . ." *Id.* at 1217 n.17. It is "sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." *Id.* at 1217 (footnote omitted).

A plaintiff also need not "plead particularized facts sufficient to sustain a 'judicial finding' either of director interest or lack of director independence" or of another disabling factor. *Grobow v. Perot*, 539 A.2d 180, 183 (Del. 1988). Rule 23.1 requires that a plaintiff allege specific facts, but "he need not plead evidence." *Aronson*, 473 A.2d at 816; *accord Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) ("[T]he pleader is not

68

required to plead evidence . . . .”). Whether the pled facts could support a “judicial finding” that the director was not disinterested or independent is “an excessive criterion” for applying Rule 23.1. *Grobow*, 539 A.2d at 183. The operative standard is the “reasonable doubt test.” *Id.*

For a trial court, “[d]etermining whether a plaintiff has pled facts supporting an inference that a director cannot act independently of an interested director for purposes of demand excusal . . . can be difficult.” *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015). When making that determination, “it is important that the trial court consider all particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other.” *Id.* “[O]ur law requires that all the pled facts regarding a director’s relationship to the interested party be considered in full context in making the, admittedly imprecise, pleading stage determination of independence.” *Id.* at 1022. Evaluating a board’s ability to consider a demand impartially thus requires a “contextual inquiry.”[30]

---

[30] *Beam* ex rel *Martha Stewart Living Omnimedia, Inc. v. Stewart (Beam II)*, 845 A.2d 1040, 1049 (Del. 2004); *see Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006) (describing the Rule 23.1 analysis as “fact-intensive”); *see also Kahn v. Portnoy*, 2008 WL 5197164, at *12 (Del. Ch. Dec. 11, 2008) (“I am convinced that these relationships, *taken together*, are sufficient to raise a reasonable doubt that Koumantzelis would be capable of exercising independent business judgment.” (emphasis added)); *Cal. Pub. Empls.’ Ret. Sys. v. Coulter*, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) (“If taken separately, none of the individual allegations would be adequate to raise a reasonable doubt as to Mandigo’s disinterest or independence. . . . Taken together, they give this Court reason to doubt that Mandigo is disinterested and independent.”)

Likewise, "it cannot be ignored that although the plaintiff is bound to plead particularized facts in pleading a derivative complaint, so too the court is bound to draw all inferences from those particularized facts in favor of the plaintiff, and not the defendant, when dismissal of a derivative complaint is sought." *Sanchez*, 124 A.3d at 122. "The well-pleaded factual allegations of the derivative complaint are accepted as true on [a Rule 23.1] motion." *Rales*, 634 A.2d 931. Once a plaintiff has made particularized allegations, the plaintiff is entitled to all "reasonable inferences [that] logically flow from particularized facts alleged."[31]

This decision accepts the defendants' position that for purposes of evaluating demand futility, the Board comprised directors Kuchenrither, Cumins, Given, Miranda, Roberts, Rotunda, and Espinosa.[32] To determine whether the Board could properly

---

[31] *Beam II*, 845 A.2d at 1048; *accord Sanchez*, 124 A.2d at 1019 (instructing the trial court to "draw all reasonable inferences from the totality of [the particularized facts pled] in favor of the plaintiffs"); *Brehm*, 746 A.2d at 255 ("Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged . . . .").

[32] As discussed in the Factual Background, Treppel contends that when he filed this action at 3:02 p.m. on July 28, 2014, the publicly known directors were Kuchenrither, Given, Espinosa, and Miranda. After 4:00 p.m. on that same day, EZCORP announced that the new directors had joined the Board, resulting in the membership that this opinion uses. In the abstract, which board to use raises a nice doctrinal question, but it need not be answered in this case because demand is futile either way. Under the defendants' view, demand is futile because reasonable doubt exists as to whether four of the seven directors could give proper consideration to a litigation demand. If this decision used the four directors that the plaintiffs identify, then demand is futile because a reasonable doubt exists as to whether three of the four directors (Kuchenrither, Given, and Miranda) could consider a demand.

consider a demand, a court counts heads. If the board of directors lacks a majority comprising independent and disinterested directors, then demand is futile.[33]

In my view, a reasonable doubt exists as to six directors: Kuchenrither, Cumins, Given, Miranda, Roberts, and Rotunda. A reasonable doubt therefore exists as to the Board as a whole.

## A. Kuchenrither

The first director is Kuchenrither, who is a senior executive at EZCORP. After cleaning house in July 2014, Cohen made Kuchenrither the interim CEO. Kuchenrither previously served as EZCORP's CFO, and he held other executive positions with EZCORP before that. Kuchenrither derives his principal source of income from his employment with EZCORP. He received approximately $1.3 million in 2011, $1.6 million in 2012, and $4.8 million in 2013. EZCORP acknowledged in its Form 10K for its fiscal year 2013, filed on November 26, 2014, that because Kuchenrither is an "executive officer" of EZCORP, he is "not independent in accordance with the standards set forth in the NASDAQ listing rules."

---

[33] *Aronson*, 473 A.2d at 812 (noting that if a board decision is "not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application"); *see Beam II*, 845 A.2d at 1046 n.8 (noting for demand futility purposes that disinterested and independent majority is required, such that a board evenly divided between interested and disinterested directors could not exercise business judgment on a demand); *Gentile v. Rossette*, 2010 WL 2171613, at *7 n.36 (Del. Ch. May 28, 2010) ("A board that is evenly divided between conflicted and non-conflicted members is not considered independent and disinterested."); *Beneville v. York*, 769 A.2d 80, 85 (Del. Ch. 2000) (Strine, V.C.) (demand futile where board is split).

Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller.[34] In those circumstances, a reasonable doubt exists as to whether the officer "can impartially consider a demand" that would involve taking action "materially adverse to [the controller's] interests." *Mizel*, 1999 WL 550369, at *3. When officers "derive their principal income from their employment," that fact "powerfully strengthens the inference" that the officers could not consider a demand on the merits, because "it is

---

[34] *Rales*, 634 A.2d at 937 (holding that President and CEO of corporation could not impartially consider a litigation demand which, if granted, would have resulted in a suit adverse to significant stockholders); *In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002) (Strine, V.C.) ("In the case of [the CEO], to accept such a [litigation] demand would require him to decide to have Student Loan sue Citigroup, an act that would displease a majority stockholder in a position to displace him from his lucrative CEO position."); *Mizel v. Connolly*, 1999 WL 550369, at *3 (Del. Ch. July 22, 1999) (Strine, V.C.) (observing that President and CEO of corporation whose position constituted his principal employment was not independent for demand-futility purposes where underlying transaction was between corporation and its controller); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995) (Allen, C.) ("The facts alleged appear to raise a reasonable doubt that Wipff, as president, chief operating officer, and chief financial officer, would be unaffected by [the CEO and significant stockholder's interest] in the transaction that the plaintiff attacks."); *see Bakerman v. Sidney Frank Imp. Co.*, 2006 WL 3927242, at *9 (Del. Ch. Oct. 10, 2006) (holding that reasonable doubt existed as to ability of insider managers of LLC to address a litigation demand focusing on the entity's controllers); *see also MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010) ("There may be a reasonable doubt about a director's independence if his or her continued employment and compensation can be affected by the directors who received the challenged benefit."); *In re Cooper Co., Inc. S'holders Deriv. Litig.*, 2000 WL 1664167, at *6 (Del. Ch. Oct. 31, 2000) (finding reasonable doubt existed as to ability of two directors, one of whom was also CFO and Treasurer and the other who was also Vice President and General Counsel, to consider litigation demand addressing actions by other directors).

72

doubtful that they can consider the demand . . . without also pondering whether an affirmative vote would endanger their continued employment." *Id.*

EZCORP's disclosure regarding the NASDAQ listing standards points in the same direction. The independence standards established by stock exchanges and the requirements of Delaware law, such that a finding of independence (or its absence) under one source of authority is not determinative for purposes of the other,[35] but the two sources of authority are mutually reinforcing and seek to advance similar goals. The fact that a director qualifies as independent for purposes of a governing listing standard is therefore a helpful fact which, all else equal, makes it more likely that the director is independent for purposes of Delaware law. The opposite is likewise true. The listing

---

[35] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 648 n.26 (Del. 2014) (agreeing with Court of Chancery that "directors' compliance with NYSE independence standards 'does not mean that they are necessarily independent under [Delaware] law in particular circumstances.'"); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015) ("[A] board's determination of director independence under the NYSE Rules is qualitatively different from, and thus does not operate as a surrogate for, this Court's analysis of independence under Delaware law for demand futility purposes."); *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 941 & n.62 (Del. Ch. 2003) (Strine, V.C.) (citing listing standards and observing that "even the best minds have yet to devise across-the-board definitions that capture all the circumstances in which the independence of directors might reasonably be questioned. By taking into account all circumstances, the Delaware approach undoubtedly results in some level of indeterminacy, but with the compensating benefit that independence determinations are tailored to the precise situation at issue."); *see Yucaipa Am. All. Fund II, L.P. v. Riggio*, 1 A.3d 310, 315 (Del. Ch. 2010) (Strine, V.C.) ("I do not lightly ignore [that Del Giudice had been determined to be independent under the NYSE listing standards], but on the limited record before me I cannot conclude that the business and political ties between Del Giudice and Riggio render Del Giudice independent of Riggio."), *aff'd*, 15 A.3d 218 (Del. 2011).

standards are therefore "a useful source for this court to consider when assessing an argument that a director lacks independence."[36]

Taken together, these facts generate a reasonable doubt as to Kuchenrither's ability to consider a demand.

**B.  Cumins**

The next director is Cumins. Unlike Kuchenrither, Cumins is not an employee at EZCORP. Instead, he is a managing director of Cash Converters, where he has worked since 1990. EZCORP owns approximately 33% of the equity of Cash Converters, giving it substantial influence over that entity. Cumins also sits on the board of Cash Converters. In March 2014, EZCORP and Cash Converters formed a joint venture to operate stores in Mexico, with EZCORP owning 80% and Cash Converters owning 20% of the venture. As with Kuchenrither, EZCORP has disclosed that Cumins is not independent for purposes of the NASDAQ listing standards.

Delaware decisions have recognized that when a director is employed by or receives compensation from other entities, and where the interested party who would be adversely affected by pursing litigation controls or has substantial influence over those

---

[36] *In re MFW S'holders Litig.*, 67 A.3d 496, 510 (Del. Ch. 2013) (Strine, V.C.), *aff'd sub nom.*, *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014); *see Sanchez*, 124 A.3d at 1024 n.25 (considering compliance with NASDAQ listing standards as a factor when evaluating director independence).

entities, a reasonable doubt exists about that director's ability to impartially consider a litigation demand.[37]

> A lack of independence does not turn on whether the interested party can directly fire a director from his day job. It turns on, at the pleadings stage, whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.

*Sanchez*, 124 A.3d at 1023 n.25.

At the very least, the pled facts suggest an inference that Cumins might feel strongly subject to Cohen's dominion as the controller of EZCORP and an individual with the ability to influence Cumins' future at Cash Converters. EZCORP's disclosure about his lack of independence for purposes of NASDAQ's listing standards reinforces that assessment. A reasonable doubt exists about Cumins' independence.

## C.     Given

---

[37] *See Rales*, 634 A.2d at 937 (finding reasonable doubt of director's independence where director "beholden to the [controlling stockholders] in light of his employment" at another company where controlling stockholders were directors and owned a majority of the stock); *Beam* ex rel *Martha Stewart Living Omnimedia, Inc. v. Stewart (Beam I)*, 833 A.2d 961, 978 (Del. Ch. 2003) (finding executive employee of one of Martha Stewart's companies beholden to Stewart), *aff'd*, *Beam II*, 845 A.2d at 1057; *Tremont I*, 1994 WL 162613, at *2 (finding reasonable doubt existed as to whether directors who served as officers of controller's affiliates could consider a litigation demand); *see also Sanchez*, 124 A.3d at 1023-24 & n.25 (discussing grounds for drawing reasonable inference that director could not act independently of interested party who held the largest block of stock in the director's employer, served as a non-independent member of the employer's board, and allegedly could influence the director's employment prospects with his employer).

The third director is Given. He has an abundance of ties to Madison Park, Cohen, and other Cohen-affiliated entities.

For starters, Given currently serves as a consultant to Madison Park, the counterparty under the Challenged Agreements. It is not clear at this stage whether Given's role as a consultant involves a degree of obligation to Madison Park that would create a situation comparable to the dual fiduciary problem identified by the Delaware Supreme Court in *Weinberger v. UOP, Inc.*[38] Writing as a Vice Chancellor, Chief Justice Strine explained at length why dual fiduciary status would render a director "unable to impartially consider a demand" involving a transaction between the two entities that the dual fiduciary served. *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1230-32 (Del. Ch. 2001), *rev'd on other grounds*, 794 A.2d 1211 (Del. 2002). On the facts presented, Given's contractual relationship with Madison Park is not automatically disqualifying, but it is a factor that counts against his ability to consider a litigation demand impartially. *See id.* at 1232.

Givens' ties to Madison Park go beyond his current consultancy. He previously served as managing director of Madison Park and was employed by that firm since 2004. During that period, Madison Park benefitted from the substantial payments it received from EZCORP, its only publicly traded client. The Complaint alleges that Madison Park is a lightly staffed firm with few resources. At the pleadings stage, it is reasonable to infer

---

[38] 457 A.2d 701, 710 (Del. 1983); *see Rales*, 634 A.2d at 933 (explaining for purposes of demand futility that "'[d]irectorial interest exists whenever divided loyalties are present'" (quoting *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984)).

that Given benefited personally from the payments that EZCORP made under the Challenged Agreements, making it less likely that Given could give impartial consideration to a litigation demand concerning the Challenged Agreements.

Next, pursuant to an advisory services agreement, Given receives advisory fees from EZCORP and its affiliates through LPG Limited (HK), his personal entity. LPG received $740,000 between October 1, 2012 and June 19, 2014. LPG received another $120,000 since July 1, 2013 for consulting work on behalf of Cash Converters. The monetary amounts support a reasonable inference that Given is beholden to Cohen.[39] Moreover, his participation in an arrangement similar to Cohen's raises doubts as to his ability to evaluate Cohen's arrangement impartially.

On top of these issues, Given has relationships with EZCORP affiliates. He serves as Vice Chairman of Change Capital Inc., a wholly-owned subsidiary of EZCORP, and as Chairman of Change Capital, Asia, another EZCORP affiliate. And EZCORP has acknowledged in its public filings that he is not independent under the NASDAQ listing requirements.

---

[39] *See, e.g.*, *Orman v. Cullman*, 794 A.2d 5, 30 (Del. Ch. 2002) (finding it reasonable to infer at pleading stage that $75,000 in consulting fees was material to director and made director beholden to controlling shareholder for continued fees); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995) (Allen, C.) ("Realism of the kind signaled by *Rales* requires one to acknowledge the possibility that a partner at a small law firm bringing in close to $1 million in revenues from a single client in one year may be sufficiently beholden to, or at least significantly influenced by, that client as to affect the independence of his judgment.").

At this stage, it is reasonable to infer that Given is sufficiently enmeshed with Cohen, Madison Park, and other Cohen-controlled entities that he could not consider a litigation demand relating to the Challenged Agreements.

**D.     Miranda**

The fourth director is Miranda. The connections that Miranda and members of his family have to Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, E.N.R. ("Finmart"), an EZCORP subsidiary, raise a reasonable doubt about his independence.

EZCORP owns 76% of Finmart's equity, making EZCORP its controlling stockholder. Miranda's family members are the minority equity owners, holding approximately 20% of its equity. The Complaint identifies by name a number of Miranda's family members who are employed by Finmart.

Delaware decisions have taken a realistic approach to the ability of a director to consider a litigation demand when moving forward with the litigation would have an adverse interest on a close family member.[40] Delaware decisions similarly have taken a

---

[40] "Close familial relationships between directors can create a reasonable doubt as to impartiality." *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) (Strine, V.C.). "While it is doubtless true that the traditional ties of loyalty and affection that exist between close family members may not exist in a particular case, the burden should not be on plaintiff to plead that such ties do not exist." *Mizel*, 1999 WL 550369, at *4; *accord Harbor Fin.* 751 A.2d at 889 ("The plaintiff bears no burden to plead facts demonstrating that directors who are closely related have no history of discord or enmity that renders the natural inference of mutual loyalty and affection unreasonable."). "While there is nothing wrong with family members serving together on a board, . . . a 'reasonable doubt' is raised when a demand would require a director to support a suit contrary to the interests of a close family member." *Mizel*, 1999 WL 550369, at *4; *see Grimes*, 673 A.2d at 1216-17 (noting that a "familial interest" can disable a director); *Grace Bros., Ltd. v. UniHolding Corp.*, 2000 WL 982401, at *10 (Del. Ch. July 12, 2000)

78

realistic approach to the ability of a director to consider a litigation demand when moving forward with the litigation would have an adverse interest on an individual who could control or significantly influence the future employment of a close family member.[41] The latter situation is one that gives "the interested party leverage over the director."[42]

---

(Strine, V.C.) (finding reasonable doubt about whether a director impartially could consider a demand adverse to the interests of his brother-in-law); *Cooper*, 2000 WL 1664167, at *6 ("The Complaint alleges that director Feghali was interested and/or lacked independence because he was Steven Singer's father in law. That family relationship is sufficient to create a reason to doubt Mr. Feghali's ability to impartially consider a demand."); *Harbor Fin.* 751 A.2d at 889 (granting inference at pleading stage that reasonable doubt existed as to director's ability to consider a litigation demand impartially when the proposed defendant was his brother-in-law); *see also Chaffin v. GNI Gp., Inc.*, 1999 WL 721569, at *5 (Del. Ch. Sept. 3, 1999) (noting that "most parents would find it highly difficult, if not impossible, to maintain a completely neutral, disinterested position on an issue, where his or her own child would benefit substantially if the parent decides the issue a certain way").

[41] *See Sanchez*, 124 A.2d at 1019 (holding that the combination of a "deep friendship" between a director and the interested party, combined with the fact that "the director's primary employment (and that of his brother) was as an executive of a company over which the interested party had substantial influence," supported "an inference that the director could not act independently of the interested party"); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *20 (Del. Ch. May 21, 2013) ("Dai also cannot consider a demand that would place Chang or Teng at risk because his daughter's primary employment depends on the good wishes of the Company's controlling stockholders."); *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 823 (Del. Ch. 2005) ("Family employment ties can give rise to concerns about the ability of directors to act independently of a company's management."), *aff'd*, 906 A.2d 766 (Del. 2006); *Cal. Pub. Empls.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) ("[I]t is a reasonable inference from the alleged particularized facts that the combination of relationships between Coulter and Mandigo, along with Coulter's position as CEO of the company that employs Mandigo's son, would be sufficiently material to preclude Mandigo from being able to consider demand without improper considerations intervening."); *see also In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *34 (Del. Ch. May 3, 2004) (basing finding that director was not independent in part on "the fact that the consulting arrangement of [the director's] son-in-law . . . with [the interested party] would be put at risk if [the director],

79

The Complaint does not identify the compensation that Miranda's family members receive from Finmart, but that omission is not fatal. "Absent some unusual fact—such as the possession of inherited wealth—the remuneration a person receives from her full-time job is typically of great consequence to her. It is usually the method by which bills get paid, health insurance is affordably procured, children's educations are funded, and retirement savings are accumulated." *In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 n.3 (Del. Ch. Jan. 8, 2002) (Strine, V.C.).

It is reasonable to infer at the pleadings stage that when considering a demand to pursue litigation against Madison Park and Cohen, Miranda would consider Cohen's ability to influence the future employment of members of his family. It is also reasonable to infer that he could consider his family's minority equity ownership in Finmart and Cohen's ability as a majority holder to take action to reduce the value of the minority stake or eliminate it. A reasonable doubt therefore exists that Miranda could consider impartially a demand to sue Cohen over the Challenged Agreements. If there were any doubt, the incremental weight of Cohen's removal of Beal and Love would tip the scales.

## E. Roberts

---

as a Special Committee member, took a position overly adversarial to [the interested party]").

[42] *AIG Ret. Servs., Inc. v. Barbizet*, 2006 WL 1980337, at *6 (Del. Ch. July 11, 2006); *see also In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *8 (Del. Ch. May 4, 2005) (analyzing whether a controller had "leverage" over particular director in assessing independence), *aff'd*, 897 A.2d 162 (Del. 2006).

The fifth director is Roberts. Unlike the first four directors, he does not have a paid employment or consulting relationship with EZCORP or its affiliates, nor is he related to anyone who does. He thus starts out as an outside director who presumably could give impartial consideration to a demand. But despite his status as an outside director, the following facts when considered together establish a reason to doubt his ability to consider a demand impartially: (i) his personal participation in the decisions to approve multiple advisory services agreements with Cohen affiliates, even after indications of problems had arisen, (ii) his immediate return to the Board after Beal and Love terminated the 2013 Renewal, and (iii) the implications of Cohen's demonstrated willingness to remove outside directors who disagreed with him.

This decision need not determine whether any one of these factors would be sufficient to call Roberts' impartiality into question. It holds only that when these factors are viewed "in their totality and not in isolation from each other," a good reason exists to doubt Roberts' independence. *Sanchez*, 124 A.2d at 1019.

### 1. Personal Participation In A Series Of Decisions That Include Those Potentially Under Attack

One contributing factor is the pattern of decisions that Roberts made during his prior years as a director, when he served as Chair of the Audit Committee (2004-2008) and as a member of the Audit Committee (2010-2013). Each year, Roberts approved or re-approved a multi-million dollar advisory services agreement with Madison Park, including two of the Challenged Agreements. Before embarking on this course, Roberts had reason to question the wisdom of an advisory relationship between EZCORP and a

Cohen affiliate: he began approving the agreements with Madison Park shortly after the Audit Committee determined that Morgan Schiff had been overcharging EZCORP for expenses.

Generally speaking, "mere directorial approval of a transaction, absent particularized facts supporting a breach of fiduciary duty claim, or otherwise establishing the lack of independence or disinterestedness of a majority of the directors, is insufficient to excuse demand." *Aronson*, 473 A.2d at 817. In other words, the fact that a director previously approved a challenged transaction is one of many factors that "standing alone" or "without more" will not call into question a director's ability to consider a demand.[43] This rule reflects an expectation that a director can be sufficiently open-minded to reflect on a prior decision and potentially assess it in a new light. It also has a practical component: Were the rule otherwise, then absent a change in board composition, "the demand requirements of our law would be meaningless, leaving the clear mandate of Chancery Rule 23.1 devoid of its purpose and substance." *Aronson*, 473 A.2d at 814.

A factor that is not sufficiently disqualifying when evaluated alone can still play a role in the overall demand-excusal analysis. In my view, for a director to have continued to approve a series of similar transactions, after an indication that the course of action

---

[43] *See, e.g.*, *Stein v. Orloff*, 1985 WL 11561, at *3 (Del. Ch. May 30, 1985) ("Mere allegations of participation in the approval of the transaction are similarly insufficient" to establish a lack of independence); *Kaufman v. Belmont*, 479 A.2d 282, 288 (Del. Ch. 1984) ("[T]he mere approval of a corporate action, absent any allegation of particularized facts supporting a breach of fiduciary duty or other indications of bias, will not disqualify the director from subsequently considering a pre-suit demand to rectify the challenged transaction.").

might not be in the best interests of the corporation, deserves some consideration in the Rule 23.1 analysis. One need not delve deeply into the extensive research on cognitive bias that has developed since *Aronson* to learn that "'the starting point of a decision process has a disproportionate effect on its outcome.'" Antony Page, *Unconscious Bias and the Limits of Director Independence*, 2009 U. Ill. L. Rev. 237, 260 (quoting Samuel D. Bond et al., *Information Distortion in the Evaluation of a Single Option*, 102 Org. Behav. & Hum. Decision Processes 240, 240 (2007)). Two straightforward forms of cognitive bias play a significant role in producing this effect: commitment bias and confirmation bias.

"Once a person has chosen a course of action, commitment bias suggests that the person will continue to act in a manner consistent with the chosen course even if later discovered information suggests that one should follow a different course." Kristin N. Johnson, *Addressing Gaps in the Dodd-Frank Act: Directors' Risk Management Oversight Obligations*, 45 U. Mich. J.L. Reform 55, 103 (2011) (citations omitted). "[C]onfirmation bias describes a tendency to disregard information that contradicts an established conclusion and unconsciously gravitate to information that confirms a previously articulated opinion." *Id.* "Groups (like boards) are particularly resistant to information indicating that they may have made a bad decision . . . . This bias deepens over time." Donald C. Langevoort, *Resetting the Corporate Thermostat: Lessons from the Recent Financial Scandals About Self-Deception, Deceiving Others and the Design of Internal Controls*, 93 Geo. L.J. 285, 294-95 (2004). Stated generally, "[i]f the director's starting point involves initial judgments, choices, or beliefs, several lines of research

show that the cognition is more likely to be confirmed." Page, *supra*, at 261 (quotation marks omitted; citing Tobias Greitemeyer & Stefan Schulz-Hardt, *Preference-Consistent Evaluation of Information in the Hidden Profile Paradigm: Beyond Group-Level Explanations for the Dominance of Shared Information in Group Decisions*, 84 J. Personality & Soc. Psychol. 322, 323 (2003)).

In this case, Roberts' starting point for evaluating a litigation demand would not just involve one prior decision that he had made to the effect that paying a Cohen-affiliated entity for advisory serves was a good use of corporate funds. It would involve eight prior decisions. It seems reasonable at the pleading stage to infer that Roberts could have difficulty reversing this pattern and authorizing a suit. Standing alone, this factor would not be dispositive, but it is part of the mix.

## 2. An Apparent Eagerness To Be Of Use

A second consideration involves the circumstances surrounding Roberts return to the Board. Roberts left the Audit Committee in September 2013, and he retired from the Board in January 2014. Four months later, in May 2014, Beal and Love terminated the 2013 Renewal. Two months after that, Cohen removed half of the Board. After cleaning house, Cohen brought Roberts out of retirement and returned him to his position as a director.

By itself, the fact that Cohen elected Roberts to the Board is not disabling. Since *Aronson*, Delaware law has applied the general rule that a director's nomination or election by an interested party is, standing alone, insufficient to raise a reasonable doubt

about his or her independence.[44] "[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence." *Aronson*, 473 A.2d 805 at 816.

Although nomination or election by an interested party, standing alone, is not dispositive, it is not necessarily irrelevant. That is particularly so where, as here, the controller returned the director to the Board under circumstances that suggest the director might be "'an easy tool, deferential, glad to be of use.'" William T. Allen, *Independent Directors in MBO Transactions: Are They Fact or Fantasy*, 45 Bus. Law. 2055, 2061 (1990) (quoting T.S. Eliot, *The Love Song of J. Alfred Prufrock, in* Collected Poems 1909-1962 (Harcourt, Brace & World 1970)). In this case, Cohen's consulting agreements had continued in place for over a decade, including during the entirety of Roberts' tenure as a director. After Roberts departed, Beal and Love terminated the 2013 Renewal. When Cohen removed them from office, he brought back the man who had

---

[44] *See Aronson*, 473 A.2d at 816; *Khanna v. McMinn*, 2006 WL 1388744, at *15 (Del. Ch. May 9, 2006) ("Directors must be nominated and elected to the board in one fashion or another, and to hold otherwise would unnecessarily subject the independence of many corporate directors to doubt." (footnotes and quotation marks omitted)); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 177 (Del. Ch. 2005) ("[P]eople normally get appointed to boards through personal contacts."), *aff'd*, 906 A.2d 114 (Del. 2006); *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *15 (Del. Ch. May 22, 2000) ("The fact that a company's executive chairman or a large shareholder played some role in the nomination process should not, without additional evidence, automatically foreclose a director's potential independence.").

approved eight consulting agreements while serving on the Audit Committee. Perhaps Roberts already had tired of retirement and was eager for a quick return to the position he left four months before. Perhaps there are other explanations. At this stage, one reasonable inference is that Cohen wanted to bring back a cooperative member of the placid antebellum regime, and another is that Roberts knew his role and remained willing to serve. Standing alone, the circumstances surrounding Roberts' return to the Board would not be dispositive, but they are part of the totality of allegations that weigh in the demand analysis.[45]

### 3. Cohen's Demonstrated Willingness To Remove Directors

A third consideration is Cohen's demonstrated willingness to remove outside directors who challenge his arrangements. Delaware decisions have long worried about a controller's potential ability to take retributive action against outside directors if they did not support the controller's chosen transaction and whether it could cause them to support a deal that was not in the best interests of the company or its stockholders.[46] The

---

[45] *Cf. In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *21 (Del. Ch. May 21, 2013) (considering circumstances surrounding and timing of outside director's resignation when evaluating his ability to properly consider a litigation demand); *Rich v. Chong*, 2013 WL 1914520, at *6, *9-10 (Del. Ch. Apr. 25, 2013) (considering director resignations in the context of demand refusal analysis); *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *12 (Del. Ch. July 26, 2010) (Strine, V.C.) (drawing inference that director potentially breached his duty of loyalty and was not entitled to exculpation where he joined after an interested transaction had been negotiated and ratified it within five days after being seated).

[46] *See, e.g.*, *Tremont II*, 694 A.2d at 428 (describing the inherent coercion present when a controlling stockholder is on the other side of a transaction as involving the "risk . . . that those who pass upon the propriety of the transaction might perceive that

Delaware Supreme Court has confirmed that controlling stockholder status does not, standing alone, give rise to concern. *See In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1183 (Del. 2015). As *Aronson* teaches, the fact that a controller has sufficient voting power to remove a director or effectively block the director's re-election is not sufficient by itself to call into question the outside directors' independence. Both the controller and the outside director effectively get the benefit of the doubt. The court does not assume that the controller would take punitive action against an outside director that acted contrary to the controller's wishes or interests, and the court similarly does not assume that the outside directors harbor concern about potentially losing their directorships that would be sufficient to influence their decision making. *See Aronson*, 473 A.2d at 815-16.

At the same time, Delaware decisions recognize that when controllers actually make retributive threats, that fact has legal significance.[47] In this case, Cohen did more than simply possess the voting power necessary to remove or elect directors. He wielded

---

disapproval may result in retaliation by the controlling shareholder"); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 617-19 (Del. Ch. 2005) (Strine, V.C.) (describing case law); *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002) (Strine, V.C.) (same).

[47] *See Lynch*, 638 A.2d at 1120 (citing threat by controller to bypass a committee); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 465 (Del. Ch. 2011) (citing threats made by controlling stockholder as "evidence of unfairness"); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 n.38 (Del. Ch. Oct. 2, 2009) ("[N]either special committee approval nor a stockholder vote would be effective if the controlling stockholder engaged in threats, coercion, or fraud."); *cf. Pure Res.*, 808 A.2d at 445 (reviewing tender offer by controlling stockholder under lower standard of review as long as "the controlling stockholder has made no retributive threats").

it to remove Beal and Love from the Board. That action conveyed more strongly than words the type of retributive threat that Cohen was willing to carry out.

In my view, giving pleading-stage effect to a controller's actual threats and retributive behavior has important integrity-preserving consequences. If a controller anticipates that threats will have legal consequences for demand futility and other doctrines, then he should be less likely to make and carry them out. That in turn should enable outside directors to better fulfill the meaningful role that Delaware law contemplates.

It is reasonable at this stage to infer that Cohen's demonstrated willingness to take retributive action affected all of the directors, including Roberts. Combined with the other two factors, a reasonable doubt exists as to Roberts' ability to consider a litigation demand.

## F. Rotunda

The sixth director is Rotunda. He served as EZCORP's CEO and as a director from 2000 through 2010. Upon departure, he entered into a consulting agreement with EZCORP that paid him $500,000 annually plus an incentive bonus of 50% to 100% of his compensation and provided healthcare benefits. The compensation elements ended in November 2013, eight months before suit was filed. EZCORP continued to pay for Rotunda's health benefits through October 31, 2015. EZCORP has identified Rotunda as a non-independent director because he "is a former executive officer of, and consultant to, the Company," and is, therefore, "not independent in accordance with the standards set forth in the NASDAQ Listing Rules."

Delaware decisions have declined to find that past service created a reasonable doubt about a former executive's independence when the individual had severed all ties with his prior employer for a meaningfully longer period than the eight months at issue here.[48] In other settings, past relationships and payments have supported a reasonable inference of "owingness" sufficient to create a reasonable doubt about the director's ability to be impartial.[49] "Although mere recitation of the fact of past business or personal

---

[48] *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 60 (Del. Ch. 2015) (noting that without additional evidence, "it is unreasonable in my view to question [director's] presumptive independence based solely on an employment relationship that ended in May 2011, almost three years before this action was filed"); *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *12 (Del. Ch. May 22, 2000) (rejecting allegation that CEO of company was not independent or disinterested for purposes of merger with company that became a large stockholder where CEO had not worked for large stockholder for more than four years, was compensated by his own company, and had a significantly larger equity stake in his own company); *see also Parnes v. Bally Entm't Corp.*, 1997 WL 257435, at *2 (Del. Ch. May 12, 1997) (finding that two directors' former employment with the company, in addition to income derived from pension and directors' fees, was insufficient to overcome presumption of independence).

[49] *See Tremont II*, 694 A.2d at 430 (crediting that director was beholden to interested party because of prior one-year consultancy during which he received $10,000 per month and more than $325,000 in bonuses); *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *3 (Del. Ch. Apr. 28, 2003) (holding in post-trial opinion that director who had been an employee of controller for more than ten years was not disinterested and independent in decision to evaluate controller's proposed merger), *aff'd*, 840 A.2d 641 (Del. 2003); *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 261 n. 45 (Del. Ch. 2006) (holding on motion to dismiss that directors who had "substantial past or current relationships, both of a business and of a personal nature, with [a controller]" were not independent); *In re Freeport-McMoran Sulphur, Inc. S'holder Litig.,* 2005 WL 1653923, at *12 (Del. Ch. June 30, 2005) ("Latiolais had worked for the Common Directors for almost twenty years and had become a wealthy individual in their employ. To argue that Latiolais was independent of the Common Directors because he formally severed ties with some Freeport entities does not take into account the nature and extent of his overwhelming, career-long involvement with Freeport entities, including the entire span

relationships will not make the Court automatically question the independence of a challenged director, it may be possible to plead additional facts concerning the length, nature or extent of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction." *Orman v. Cullman*, 794 A.2d 5, 27 n.55 (Del. Ch. 2002).

In this case, Rotunda's past ties combines with Cohen retributive behavior and his lack of independence for purposes of NASDAQ listing standards. Taken together, these factors raise a reasonable doubt as to his ability to consider a litigation demand impartially.

---

of MOXY's life. Delaware law recognizes that such extensive ties can operate as an exception to the general rule that past relationships do not call into question a director's independence."); *In re The Limited, Inc.*, 2002 WL 537692, at \*7 (Del. Ch. Mar. 27, 2002) ("One may feel 'beholden' to someone for past acts as well. It may reasonably be inferred that Mr. Wexner's gift of $25 million to Ohio State was, even for a school of that size, a significant gift. While the gift was not to Gee personally, it was a positive reflection on him and his fundraising efforts as university president to have successfully solicited such a gift. In this context, even though there can be no 'bright line' test, a gift of that magnitude can reasonably be considered as instilling in Gee a sense of 'owingness' to Mr. Wexner."); *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 1192206, at \*1 (Del. Ch. Sept. 28, 2001) (recognizing that "past benefits conferred by [the allegedly dominating director], or conferred as the result of [that director's] position with Ply Gem, may establish an obligation or debt (a sense of 'owingness' upon which a reasonable doubt as to a director's loyalty to a corporation may be premised"); *In re New Valley Corp.*, 2001 WL 50212, at \*8 (Del. Ch. Jan. 11, 2001) (observing when considering allegations of interest and lack of independence that "[t]he facts alleged in the complaint show that all the members of the current Board have current or past business, personal, and employment relationships with each other and the entities involved"); *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at \*6–9 (Del. Ch. Apr. 22, 1997) (Allen, C.) (holding on a motion to dismiss that directors were not independent based on history of dealing and overlapping governance relationships).

## IV.    CONCLUSION

Count IV of the Complaint is dismissed for failure to state a claim on which relief can be granted. Count III is dismissed as to Cohen on the same basis. Otherwise, the motions to dismiss are denied.